[No. F008068. Fifth Dist. June 30, 1988.]

COUNTY OF MARIPOSA et al., Plaintiffs, Cross-defendants and Respondents, v.
YOSEMITE WEST ASSOCIATES et al., Defendants, Cross-complainants and Appellants;
INTERWEST CORPORATION, Defendant and Appellant.

YOSEMITE WEST OWNERS' ASSOCIATION, Plaintiff and Respondent, v.
YOSEMITE WEST ASSOCIATES et al., Defendants, Cross-complainants and Appellants;
INTERWEST CORPORATION, Defendant, Cross-complainant and Appellant;
COUNTY OF MARIPOSA et al., Cross-defendants and Respondents.

EDWARD RINGROSE et al., Plaintiffs, Cross-defendants and Respondents, v.
YOSEMITE WEST ASSOCIATES et al., Defendants, Cross-complainants and Appellants;
YOSEMITE WEST OWNERS' ASSOCIATION, Defendant and Respondent;
COUNTY OF MARIPOSA et al., Cross-defendants and Respondents.

COUNSEL

Rankin, Oneal, Center, Luckhardt & Lund, Arthur K. Lund, Edward P. Davis and Marc D. Rosati, for Defendants, Cross-complainants and Appellants.

Dietrich, Glasrud & Jones, Timothy J. Buchanan, Walstad & Babcock, Paul J. Walstad, Mary Louise LeCheminant and Michael C. Van for Defendant and Appellant and for Defendant, Cross-complainant and Appellant.

Richard Matranga, William I. Cohen and William J. Keough for Plaintiffs, Cross-defendants and Respondents and for Cross-defendants and Respondents.

Flanagan, Mason, Robbins, Gnass & Corman and Michael L. Mason for Plaintiff and Respondent and for Defendant and Respondent.

OPINION

STONE (W. A.), J.—In December 1966, appellants, Yosemite West Associates[1] (YWA), presented to respondent, County of Mariposa (County), plans to develop approximately 900 acres of land adjacent to Yosemite National Park into a recreational area which would include home sites, condominiums, town houses, a hotel, restaurants, a commercial area and recreational facilities. The first phase of the project was to subdivide 135 acres of land into a 293-lot residential area called "Yosemite West Subdivision, Unit Number One" (Unit #1). In 1967 YWA and the County entered into a subdivision agreement for Unit #1 which provided, in pertinent part, that YWA would complete all necessary improvements, including water system, water storage and fire hydrants; initiate and consummate assessment bond proceedings for the completion of the improvements; and initiate the formation of Yosemite West Maintenance District (Maintenance District). The agreement further provided that YWA "shall indemnify and hold harmless the County from any and all loss, damage, or liability resulting from [YWA's] performance or non-performance of [its] duties" under the agreement.

YWA retained the services of James W. Tolladay, a civil engineer with the firm of Jorgenson and Tolladay, to prepare the necessary plans, specifications and other documents for the construction and installation of

---

[1] Yosemite West Associates is a limited partnership. Its general partner is 40-Acres, Inc., a California corporation. Yosemite Highlands, Inc. and Hennes Ridge Associates are wholly owned subsidiaries of Yosemite West Associates.

the improvements. In a letter to YWA's president and general manager, John Doubt, Tolladay urged Doubt to persuade the County to appoint Tolladay as "Engineer of the Work" so that Tolladay could adequately look out for YWA's interests. Tolladay was appointed engineer of the work and as such had complete control over the project. The County put the project out for bid in 1967, and the construction firm of George Reed, Inc. was selected as the general contractor. Tolladay prepared all of the contract documents sent out to bid. The County also hired the firm of Hanna Brothers to do the final inspection of the project; however, Tolladay's interpretation of the plans and specifications was controlling, and Tolladay's decisions were final.

In April 1971, YWA entered into an agreement with defendant and appellant, Interwest Corporation of Utah, to develop the second phase of the project which involved the building of 48 condominiums on approximately 1.2 acres of land adjacent to Unit #1. YWA was responsible for the land development, including off-site improvements such as the water and sewer systems, and Interwest was responsible for the construction and sale of the condominiums.

In January 1972, Doubt presented the proposed map and summarized the condominium project for the Mariposa County Planning Commission. The planning commission unanimously rejected the project based upon the advice of two county engineers that the existing water and sewer systems in the Yosemite West Maintenance District that were designed to meet the needs of the homeowners in Unit #1 would not be adequate to meet the additional needs of the condominium project. This decision was appealed to the Mariposa County Board of Supervisors who approved the project based upon promises by YWA that several conditions would be met before the condominiums were sold. These promises were embodied in the February 1973 agreement between YWA, Interwest and the County. First, 10 acres were to be dedicated to the County to be used by the Maintenance District for sewer plant expansion. Second, YWA would develop a well that would provide 100 gallons of potable water per minute to be proven and tested to county standards. Third, all necessary parts of the water and sewer systems were to be dedicated to the County within 12 months of the date of the agreement. Until the 100-gallons per minute requirement was reached on the existing water system, the condominium project was allowed to hook up with the Maintenance District, but could use only one of three wells (well No. 2) within the system so that homeowners in Unit #1 would not experience a loss of water supply. In April 1973 the agreement was amended to provide that the foregoing conditions were to be completed by October 1, 1973. The 100-gallon per minute requirement was not met until 1985.

1. *Problems With the Water System*

A. *Adequate Water Supply*

Before the project plans were presented to the County in 1966, YWA obtained hydrologists' reports regarding water potential which indicated limited availability of water at the upper elevations and sufficient availability at the lower elevations, specifically, the Indian Creek area. Indian Creek was always considered to be the best source of a constant and sufficient supply of potable water, but it was considered to be a last resort because of the expense involved in constructing a pipeline system up the hill to the project. Instead, YWA exhausted all potential sources at the upper elevations, which proved to be evasive.

From the very beginning the supply was inadequate to meet County standards. During construction in 1968 the contractor experienced water shortages. The shortages were discussed in a report by the County's engineer, in which it was concluded that only one-sixth of the minimum requirements of water was available in the existing system. In response to the report the board of supervisors requested that YWA guarantee an adequate water supply before the project would be approved, and Doubt provided such a guarantee.

The preceding year (1967), YWA applied for a public subdivision report from the Division of Real Estate of the State of California (DRE). The DRE would not issue a final public report until it was certain that "financial arrangements have been completed for the installation of water service to the individual lots in this tract, that ample water and service are available, and that same will be furnished on demand without exception." The matter was referred by Doubt to Tolladay, who wrote a letter to the DRE certifying an adequate water supply and financial resources to develop the supply based upon well tests and the assessment district bond. Subsequent to the issuance of the final report in 1969, it was discovered that the water supply was inadequate; but the DRE was not apprised of this fact, and YWA continued to give prospective purchasers the DRE report which was based on there being an adequate water supply.

YWA began negotiations with Interwest in 1970 to develop the "Yosemite West Subdivision, Unit Number Two" (Unit #2) condominium project because YWA was not in a position to undertake the project. Throughout negotiations, YWA represented to Interwest that there was an adequate supply of water.

In July 1971, YWA inquired of the County regarding the charges for connecting the condominium project to the Yosemite West Maintenance

District and advised the County that information was needed for Interwest's application for a public report from the DRE. In December 1971, Doubt presented to the county planning commission YWA's plans regarding annexation of the condominium project to the Maintenance District. The County's engineers objected to the condominiums being connected to the Maintenance District because the water and sewer systems within the district would not be able to handle the additional load. When Interwest filed its application with the DRE for a public report, it discovered that a report would not issue until water supply (and sewer system) problems were resolved. It appeared that the problems were resolved when the County, YWA and Interwest entered into the February 1973 agreement and the condominiums were allowed to hook up with the Maintenance District using only one of the wells (well No. 2) until YWA developed a well within the Maintenance District that would produce 100 gallons of potable water per minute.[2] This agreement provided that the County would approve the tentative map for the condominium project based upon YWA's promise that the expansion of the water and sewer systems, including a 100-gallon per minute well, would be completed by October 1, 1973.

As of August 1973, YWA had not developed a 100-gallon per minute well, and the County advised Doubt that the County would pursue legal action if YWA did not comply with the agreement. By October 1974, YWA still had not complied with the agreement, and the County again threatened legal action. In response, Doubt advised the County that he believed that the 100-gallon per minute potential would not be necessary until sometime in the distant future, around the year 2000, when the entire project was developed. In fact, because of limited resources, YWA was unable to develop the Indian Creek location where potable water at the rate of 100 gallons per minute was almost certain to be found. In 1976 YWA began making plans to develop the Indian Creek well. It was not until 1985 that the Indian Creek location was developed and potable water at 100 gallons per minute was made available to the Maintenance District.

B. *Adequate Water Storage*

The original storage tank constructed as required by the 1968 agreement between YWA and the County was designed to hold approximately 150,000 gallons of water for domestic consumption and fire protection for Unit #1. Robert Ritchey, a civil engineer and former chief engineer of the San Jose Water Company, testified that the 150,000 gallon capacity was inadequate to meet the needs of Unit #1 and was grossly inadequate to handle the addition of Unit #2. Indeed, it would provide less than one-half of the

---

[2] In fact, well No. 2 was not hooked up until 1975 or 1976.

domestic and fire protection needs of the combined residential and condominium projects.

C. *Fire Hydrants*

There are approximately 24 fire hydrants within the boundaries of the Yosemite West Maintenance District. According to the special districts manager for the County, many of the hydrants were placed on the fill side of the road as opposed to the cut side of the road, which makes it difficult to place effective thrust block kickers which are designed to prevent extreme water pressure from blowing the hydrant off the pipe connecting it to the main water line. In addition, none of the hydrants has a gate valve between the hydrant and the main line to allow the flow of water to the hydrant to be shut off in the event a hydrant is blown off of the line or knocked off of the system by accident. An example of this problem occurred one winter when snow removal equipment slid off the edge of the road in a storm and broke one of the hydrants off from the system. The maintenance crew was unable to shut off the water in time to prevent extensive loss of water through the line.

2. *Problems With the Sewer System*

The sewer system within the Maintenance District as originally designed by Tolladay involved a mechanically aerated oxidation cell with effluent to be disposed of by sprinklers or contour furrows. However, the California State Sanitarian preferred a leach field system, and Tolladay revised his plans to incorporate the state sanitarian's ideas. When completed, the system involved a lined aerated pond followed by discharge into a leach field located on a steep slope and consisting of four terraces cut into the slope.

Every year during the spring snow melt the system developed problems. Sewage would come to the surface and run down the hill toward Indian Creek.

In 1972, when Interwest and YWA were in the process of developing the condominium project, the County's health officer advised the DRE that the existing sewage system would not support the condominium project. According to the health officer, the sewage plant was "so far from meeting state standards that I find no reason to feel it will not fail."

The California Regional Water Control Board and state and county health departments determined at some point around 1978 that the system was almost inoperable. Maintenance personnel attempted unsuccessfully to repair the system until 1983, when it became necessary to open the system

to determine exactly what was causing the problems. At this time it was discovered that the system was not built in conformance with the original plans drawn by Tolladay. Extensive repairs and improvements were required in order to correct the deficiencies.

Walter Rowland, Professor of Civil Engineering at California State University, Fresno, testified that Tolladay's design was defective. Rowland supervised the preparation of a study of the system by one of his graduate students in which it was concluded that several factors led to the failure of the system, but that the biggest reason was poor initial design.

"One of the major faults of the system is that no provision has been made for the settling of any suspended solids (SS). Most of the suspended solids are kept in suspension by the action of the two surface aerators and are carried out of the pond in the effluent.

". . . . . . . . . . . . . . . . . . . . . .

"In addition to suspended solids being discharged from the pond, large floatable solids are not being removed. Because there is no preliminary treatment prior to the aerated lagoon, such as screening or comminution (shredding), and because solids are kept suspended in the lagoon, large solids such as feminine hygiene products, tampon applicators, condoms, rags, paper, and feces are flowing over the effluent weir.

". . . . . . . . . . . . . . . . . . . . . .

"Running aerated sewage into a leachfield without provision for solids removal is ridiculous. Whatever absorbtive capacity the soil originally had would be quickly diminished by clogging of the soil pores. Water will travel the path of least resistance, and traveling through a bed of packed gravel or clogged soil represents a very large head loss. Currently, the path of least resistance is to the ground surface and down the hill, eventually reaching Indian Creek, which flows into the Merced River . . . .

". . . . . . . . . . . . . . . . . . . . . .

"Another problem in the design of the disposal field is that it offers no flexibility in its operation. . . . The current system provides no flexibility in diverting flows to different parts of the field. Thus, the same soil strata is continuously inundated with effluent, allowing no opportunity for recovery."

The County filed suit against YWA and Interwest. The complaint contained causes of action for breach of contract, negligent misrepresentation, and fraud. The County sought specific performance of the agreements and an injunction against further development by YWA and Interwest. Inter-

west filed a cross-complaint against YWA for declaratory relief and indemnity. YWA filed a cross-complaint for injunctive relief and damages.

Yosemite West Owners' Association (condominium owners) also filed suit against YWA and Interwest. The complaint contained causes of action for fraud, negligent misrepresentation, breach of warranty, breach of contract and negligence. It was alleged that YWA and Interwest had led the condominium owners to believe that there was an adequate source of potable water and that the source had been developed when YWA and Interwest knew or should have known that no such source had been developed. It was alleged that the condominium owners were third party beneficiaries to the agreements with the County and that the necessary improvements had been negligently constructed. The condominium owners sought specific performance of the agreements and damages. Interwest filed a cross-complaint against YWA for declaratory relief and indemnity. YWA filed a cross-complaint against the County and claimed that the County was at fault for failing to provide the condominium owners with the necessary services through the Yosemite West Maintenance District.

Homeowners in Unit #1 filed a class action suit against YWA, claiming breach of contract and fraud. The complaint alleged that the homeowners were third party beneficiaries to the 1967 agreement between the County and YWA and sought specific performance of the agreement and to enjoin the sale of land adjacent to Unit #1. It was also alleged that YWA had misrepresented the adequacy of the water and sewer systems. YWA filed a cross-complaint against the County and claimed that the County was at fault for failing to provide the homeowners with the necessary services through the Maintenance District. The three actions were consolidated.

The homeowners filed a first amended and supplemental complaint against the County and the condominium owners. It was alleged that the County was without authority to permit the condominium development to hook up with the Maintenance District because the condominium development was not within the boundaries of the Maintenance District or assessment district. The homeowners sought to enjoin the use of Maintenance District facilities by the condominium project. The complaint also alleged that the homeowners were third party beneficiaries to the agreement between YWA, Interwest and the County whereby the condominium project was allowed to hook up with the Maintenance District and that the agreement had been breached in that YWA had failed to develop a well that would produce potable water at a rate of 100 gallons per minute as required by the terms of the agreement. The homeowners sought specific performance of this agreement. The complaint also sought to enjoin the sale by YWA of certain pieces of real property that were to be dedicated to the

Maintenance District for the benefit of the homeowners pursuant to the agreements with the County.

After trial without a jury, the court issued its statement of decision and rendered judgment in favor of the County for $344,684, which included the following: (1) $95,000 for remedial work to the sewer system; (2) $22,500 reimbursement for sums previously spent by the County to repair the sewer system; (3) $36,000 for gate valves and thrust block kickers for the fire hydrants; and (4) $191,184 reimbursement for sums previously spent by the County to improve water storage facilities.

Judgment was also rendered against YWA and Interwest on the basis of joint and several liability for $134,400, which was the cost of annexing the condominium project to the Maintenance District.

The motions of both YWA and Interwest for a new trial were denied, and both parties now appeal.

## THE ISSUES

YWA contends that it cannot be held liable for breach of contract for three reasons: (1) it was under no obligation pursuant to any of the agreements with the County to construct and install the water and sewer systems; (2) assuming there was such an obligation, there was no warranty contained in the agreements with respect to the adequacy of the water and sewer systems; and (3) assuming there was a breach of contract, the County is precluded from recovering damages because it accepted and approved the systems as constructed and installed. YWA contends that it cannot be held liable for negligence for three reasons: (1) the dual agency status of Tolladay as engineer for both YWA and the County precludes recovery by the County for Tolladay's negligence; (2) there is insufficient evidence that the systems were defective; and (3) assuming the systems were defective, YWA is absolved of any liability because the County accepted and approved the systems as designed, constructed and installed. YWA contends that it cannot be held liable for the payment of fees for the annexation of the condominium project to the Maintenance District for two reasons: (1) there was no actionable fraud by Interwest regarding the sufficiency of the water supply to the condominium project; and (2) assuming there was fraud, there is insufficient evidence of a joint venture between YWA and Interwest upon which to base joint and several liability.

Interwest contends there is insufficient evidence of a joint venture upon which to base joint and several liability, insufficient evidence of fraud on its part, and it was error not to allow Interwest's claim for indemnification against YWA. Interwest also alleges it was error to award damages insofar

as they relate to the adequacy of the water supply since in 1985 YWA came into full compliance with the County standards for water supply.

■ Our task is two-fold. First, we must determine whether the judgment and award of damages is correct upon any theory of law, regardless of the consideration which may have moved the trial court to its conclusion. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].) Second, we must determine whether there is any substantial evidence, contradicted or uncontradicted, which will support the trial court's factual determinations. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) The judgment is presumed to be correct, and all inferences are to be drawn in favor of the judgment. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) Substantial evidence, as has often been held, is evidence "of ponderable legal significance." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) It is evidence "reasonable in nature, credible, and of solid value." (*Ibid.*)

I

LIABILITY FOR THE DEFECTIVE WATER AND SEWER SYSTEMS

A. *Sufficiency of the Evidence to Sustain the Trial Court's Finding That the 1967 Agreement Created a Duty on the Part of YWA to Design, Construct and Install Reasonably Workable Water and Sewer Systems*

■ YWA argues that because the County put out the bids on the original improvements, selected the general contractor, executed the contract with the general contractor and retained an inspector to make certain the general contractor was following the plans as accepted by the County, it was the County's obligation to construct and install the water and sewer systems. However, the 1967 agreement provides that as consideration for the County's approval of the final subdivision map YWA, as subdivider, "agrees to complete the work of improvement required in said subdivision . . . ." The agreement identifies the sewer system and water system as improvements.

■ It is well established that any reasonable construction of a written instrument by the trial court will be upheld under the general rule of conflicting evidence when conflicting extrinsic evidence is admitted to prove its terms. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 772 [128 P.2d 665].) ■ Based on the facts presented at trial, the court could properly rely upon the plain language of the agreement itself and reject conflicting extrinsic evidence to ascertain the obligations of the parties. The court's finding that YWA had a duty under the 1967 agreement to

construct and install reasonably workable water and sewer systems is supported by the evidence.

B. *Sufficiency of the Evidence to Sustain the Trial Court's Finding That the Water and Sewer Systems as Designed, Constructed and Installed Were Defective*

1. *Water System*

The County's expert, Robert Ritchey, testified that the water storage capacity was inadequate to meet the needs of Unit #1 (homes) and grossly inadequate to handle the additional needs of Unit #2 (condominiums).

YWA contends this testimony is of no value because state standards to determine storage needs were not promulgated until 1970, after the system had been installed. Were we to accept this argument, there could be no finding of negligent design or construction unless and until the state established applicable standards. This is not the law. It is universally accepted that the standard of care in a particular industry may be established by its practitioners. (See, e.g., *Wright* v. *Williams* (1975) 47 Cal.App.3d 802, 810 [121 Cal.Rptr. 194].) Ritchey was qualified as an expert in the field, and his expert opinion regarding the standards for water storage capacity is evidence which must be given credit.

YWA next contends that Ritchey's testimony regarding the inadequacy of the water storage capacity is of no value since he included in his analysis the condominium project which did not come on line to the water system until 1972, when the system was owned and operated by the Maintenance District. This is a mischaracterization of Ritchey's testimony. He testified that the system was inadequate to handle the needs of Unit #1, even without the addition of Unit #2.

There is sufficient evidence to support the court's finding that the water system was defective.

2. *Sewer System*

YWA contends the only evidence that the sewer system was defective was the testimony of the County's expert, Dr. Walter Rowland, and that his testimony is insufficient because he owns property in Yosemite West, he has never designed a mountain sewer system and has been confined to the world of academics for 20 years. YWA points to the testimony of its own expert, Fred Rabe, that the system would have functioned properly if constructed according to Tolladay's plans, and points to

Tolladay's testimony, based upon 30 years of practical experience, that his design was not defective.

■ "[I]n examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding." (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].)

■ It is not enough that there is more evidence against than in favor of a judgment. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 282, p. 293.) "Of course, all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].)

■ We do not second-guess the trial court's decision to accept as true the testimony of Dr. Rowland. The court was obviously aware of his potential bias as a homeowner in Yosemite West and aware of his qualifications or lack thereof. Even assuming that Dr. Rowland's testimony is of no value as YWA contends, there is other evidence to substantiate the trial court's finding that the system was defective. The County's sanitarian concluded in a memo dated December 27, 1971, that the system would fail when placed under a continuous load. We note that in a letter to the County's health officer dated December 12, 1972, even Tolladay was uncertain about the adequacy of the system.

"We feel that unless the system's inadequacy is proven, this leaching system must be tried and used up to its actual capacity. The only valid way to prove its adequacy is through the test of time and the addition of sewage as the development continues to grow."

YWA ignores testimony that the system experienced problems every spring during the snow melt when sewage came to the surface and ran down the hill toward Indian Creek. The County's health officer stated in a letter to the DRE that the sewage plant was "so far from meeting state standards that I find no reason to feel it will not fail." The California Regional Water Control Board and state and county health departments determined at some point in 1978 that the system was almost inoperable. YWA also

ignores the extensive report commissioned by Dr. Rowland which is extremely critical of the design of the sewer system.

The evidence is sufficient to support the trial court's finding that the sewer system was defective in its design and construction.

### C. Common Agency Status of Tolladay

■ YWA asserts the only possible predicate for a finding of liability on its part for the defective systems is the negligence of Tolladay. According to YWA, while Tolladay designed the systems as an agent of YWA, as engineer of the work he was an agent for the County. Because there is a well-established rule that where the common agent negligently performs work of interest to both controlling entities, the argument continues, the agent's negligence must be imputed to both controlling parties in any action between them and bars recovery by one controlling party from the other for injury caused by the common agent's negligence. YWA cites as authority for this proposition *Marsh* v. *Tilley Steel Co.* (1980) 26 Cal.3d 486 [162 Cal.Rptr. 320, 606 P.2d 355] and *Societa per Azioni de Navigazione Italia* v. *City of Los Angeles* (1982) 31 Cal.3d 446 [183 Cal.Rptr. 51, 645 P.2d 102].

*Marsh* v. *Tilley Steel Co., supra,* 26 Cal.3d 486, involved the issue of "special employment," where an employee's general employer lends the employee to another employer and while working for the borrowing employer the employee causes injury to another worker. The issue was whether the injured worker could sue the general employer under a theory of respondeat superior or whether he was limited to his worker's compensation remedy against the borrowing employer. We are not here concerned with the liability of a general employer for damages to a third party as the result of an employee's negligence. The issue here is whether one principal can hold another principal liable for damages it suffers as the result of the negligence of a common agent.

In *Societa per Azioni de Navigazione Italia* v. *City of Los Angeles, supra,* 31 Cal.3d 446, the court stated in dicta, "As regards the City's pilot-caused damages, the pilot's status as the servant of both the City and the Shipowner previously would have barred the City from effectively asserting any liability for these damages against the Shipowner. Traditionally, the negligence of a common employee has been imputed against both his employers in any action between them, thereby effectively barring either employer from collecting damages from the other for any 'personal' injury sustained as a result of a common employee's negligence. [Citations.] Whether this should be the rule here is open to question in light of the development of comparative fault principles." (*Id.* at p. 462; fn. omitted.)

The circumstances in *Societa per Azioni de Navigazione Italia* involved *personal injury* sustained by *third parties* as the result of the common agent's negligence and not *economic damage* sustained by a *coprincipal* as the result of the common agent's negligence. Likewise, *Societa per Azioni de Navigazione Italia* is not on point.

However, we need not resolve the issue of dual or common agency, and any pronouncements we might make on the subject would be dicta. First, regardless of whether the defective systems were the result of Tolladay's negligence, and regardless of his status as a dual or common agent, YWA was ultimately obligated under the terms of the 1967 agreement to design, construct and install a reasonably workable water and sewer system, which it failed to do.

Second, the 1967 agreement provided: "The Subdivider [YWA] shall indemnify and hold harmless the 'County' from any and all loss, damage, or liability resulting from Subdivider's performance or nonperformance of his duties under this Agreement, or from negligence of himself or his agents, servants and employees."

Even assuming Tolladay was the County's agent as engineer of the work, he designed the systems prior to his appointment by the County while working as YWA's engineer. The hold harmless and indemnification clause applies to losses caused by his defective design as commissioned by YWA.

## D. *The County's Acceptance and Approval of the Work*

■ YWA relies upon *Sheffet v. County of Los Angeles* (1970) 3 Cal.App.3d 720 [84 Cal.Rptr. 11] for the proposition that where a public entity approves and accepts as a public improvement private construction by a subdivider, the public entity, not the subdivider, is liable for any damages resulting from the design or construction of that public work. (*Id.* at p. 735.) In *Sheffet,* a property owner brought an action against the county and a developer for damages and injunctive relief because housing development had caused water and mud to drain from the land and streets owned by the defendants across his property and into a drainage ditch. The trial court concluded that the action was in the nature of inverse condemnation (*id.* at p. 731) and that the developer could not be held liable in an inverse condemnation suit.

"In the absence of something in the nature of a protective covenant, where a public entity approves the plans for a subdivision, including a drainage system, and there is damage to adjacent property as a result of those improvements, the public entity, not the subdivider, is liable in an

inverse condemnation suit. [Citations.]" (3 Cal.App.3d at p. 735.) However, the *Sheffet* court went on to state: "The whole of the injunction goes to the manner of discharging waters, none of which are within the control of defendant [developer]. We do not say that a prohibitory injunction against active negligence on the part of [developer] to the extent it may still have property interests in the tract would not be proper. This, however, is not the purport of the injunction as ordered. As we have heretofore noted in footnote 1, there has been a waiver of appeal by [developer] from that portion of the judgment relative to the damage award of $50. There is no evidence of negligent conduct by [developer] contributing to or causing the water or mud flow other than would naturally result from the terrain alteration and the concentration of the surface waters into the streets. We can readily envisage a situation where a subdivider, during development of the property, may have a duty to prevent ground erosion and the depositing of soil or debris on the land of the lower owner. It would seem reasonable to require a subdivider to take preventive measures to preclude such incidents, and nothing we say here negates responsibility for such negligence, but that is not encompassed in the problem now before us." (*Id.* at pp. 735-736.)

We are somewhat uncertain what the *Sheffet* court meant when it qualified the limitation of liability with language about the absence of a "protective covenant." None of the cases cited by the court speaks of such a covenant. However, taken in conjunction with the later discussion of active negligence on the part of the developer, it is clear that the exclusion from liability applies only in inverse condemnation actions and not where the developer has some affirmative duty to avoid the harm suffered as the result of his negligence, such as in this case where the developer undertook to perform improvements pursuant to a contract with the public entity.

YWA also cites *Blau v. City of Los Angeles* (1973) 32 Cal.App.3d 77 [107 Cal.Rptr. 727] to support its contention that it is absolved of liability because of the County's participation in the improvements. In *Blau,* the court relied upon *Sheffet* in holding that the developer could not be held strictly liable for damages suffered by a property owner as the result of defective improvements because the public agency participated in the development.

"A public entity is 'on an equal footing' with a developer, not only as to 'economic position to bear the loss,' but also because the public agency itself participates in the development through competent inspection by its own professional advisers and through its mandatory requirements of submission of plans, maps and data for any 'protective changes' it may require before granting its legally required authorization and considered approval." (32 Cal.App.3d at p. 91.)

However, we are not here concerned solely with whether the developer can be held strictly liable for damages to a third party. The question in this case is whether the developer can be held liable to the County for damages resulting from the developer's breach of contract and negligence. *Blau* is therefore distinguishable.

In *Fisher* v. *Morrison Homes, Inc.* (1980) 109 Cal.App.3d 131 [167 Cal.Rptr. 133], the court distinguished both *Blau* and *Sheffet*. "Both involved suits for inverse condemnation and, quite rightly under constitutional principles, held the public entity and not the private developer liable for taking of private property for a public use. [Citation.] In both cases, potential developer tort liability was carefully distinguished." (*Id.* at pp. 136-137.) In discussing potential developer liability the court stated, "[A] developer performs a service in designing and constructing improvements to the real property it eventually deeds away and must accept responsibility for pre-dedication negligence." (*Id.* at p. 138; fn. omitted.) The court went on to note, "It is easy to imagine that a developer, anxious to cut costs, might feel less compelled to perform up to the standards of his profession were immunity automatically conferred upon dedication to the city." (*Ibid.*) However, where the degree of involvement by the public entity in the planning and execution of a project is tantamount to requiring adherence to its specifications, the developer will not be liable. (*Id.* at p. 139.) For this reason the court held that the nature of the relationship created between the public entity and the developer through the process of design, construction, dedication and acceptance becomes a determinative issue of fact. (*Ibid.*) Dedication and acceptance alone are "insufficient to resolve the question of degree of municipal responsibility for the defect-causing negligence." (*Ibid.*)

None of the foregoing cases deals with the issue of whether the developer can be held liable to the public agency for defective design, construction and installation where the developer has entered into a contract with the public entity to design, construct and install reasonably workable improvements such as water and sewer systems. It is a question of fact whether the public entity's participation in the project was so active and pervasive as to constitute some form of waiver or absolve the developer of any liability for breach of contract or negligence.

The trial court found with respect to this factual issue: "With regard to the controverted issue of the extent of the County's involvement in those matters, the defendants were obligated to perform (both contractually and due to a duty of care), and the effect of such involvement upon the obligation of the defendants, the Court's decision is that the County's involvement was passive and minimal in connection with the installation and construction of the improvements and other matters the defendants were obligated

to perform and that the obligations of the defendants are not affected by the involvement of the County, nor are the defendants in any way excused or absolved from any liability by reason of the involvement of the County."

There is sufficient evidence to support this finding. Under the 1967 agreement YWA was completely responsible for the satisfactory installation of the improvements and was to indemnify and hold the County harmless in connection with the improvements. The independent inspector appointed by the County was answerable to Tolladay, whose decision was final. Although Tolladay was appointed by the County as engineer of the work, he perceived his role as being to protect the interest of YWA and not the County, so that his approval or acceptance of the plans and specifications and construction of the systems could not be imputed to the County. The County never accepted or approved the work but continued to request that YWA remedy deficiencies, until it concluded that YWA never intended to perform as agreed, at which time the County initiated legal action.

## II

### JOINT AND SEVERABLE LIABILITY OF YWA AND INTERWEST FOR THE PAYMENT OF ANNEXATION FEES

#### A. *Sufficiency of the Evidence of Fraud*

One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers. (Civ. Code, § 1709.) Deceit is defined in Civil Code section 1710 as the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; or, the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact.

The elements which must be established to prove fraud for mere nondisclosure in cases involving the sale of real property are (1) nondisclosure by the defendant of facts materially affecting the value or desirability of the property; (2) the defendant's knowledge of such facts and of their being unknown to or beyond the reach of the plaintiff; (3) the defendant's intention to induce action by the plaintiff; (4) inducement of the plaintiff to act by reason of the nondisclosure; and (5) resulting damages. (*Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729, 738 [29 Cal.Rptr. 201, 8 A.L.R.3d 537].)

Interwest began selling condominiums in 1974. Those who purchased condominiums in Unit #2 were given a packet which contained a

"Final Subdivision Public Report" from the California Department of Real Estate which stated, in part: "WATER: Yosemite West Maintenance District." The obvious inference is that the condominiums were within the Maintenance District. Purchasers were not told that they were not members and not within the boundaries of the Maintenance District or that they would receive water and sewer services pursuant to an agreement between the County, YWA and Interwest. They were also not told that YWA had breached the agreement by not developing a well that would produce 100 gallons per minute of potable water by October 1, 1973. In other words, they were not told that they were at risk of losing water and sewer services. Their ability to receive these services would obviously affect the desirability of the property. Almost any buyer would hesitate to purchase one of the condominiums if it were known that there was a risk that water and sewer services might be discontinued. Interwest had knowledge of these facts, and there is sufficient evidence from which to infer that in order to induce the purchase of condominiums these facts were concealed.

Interwest's contention that the condominium purchasers should be charged with knowledge of what was contained in public records, specifically, the boundaries of the Maintenance District, is without merit. Purchasers had no reason to believe that Interwest would misrepresent or not disclose the true facts and therefore had no reason to search the public records for a map of the Maintenance District.

There was sufficient evidence to support the trial court's finding of fraud.

B. *Sufficiency of the Evidence of a Joint Venture Between YWA and Interwest*

The trial court concluded that the condominium unit owners had no legal right to receive services from the Maintenance District since they were not within its boundaries and that in order to continue to receive these services they must join the Maintenance District. It therefore concluded that YWA and Interwest were jointly and severally liable for the payment of annexation fees. ▇▇▇ The basis for joint and several liability was the finding of a joint venture between YWA and Interwest. Both YWA and Interwest challenge the sufficiency of the evidence to support the finding of a joint venture.

The factual basis for the trial court's finding a joint venture was as follows: "[T]he defendants formed a joint venture by associating themselves together in the common enterprise of developing, constructing and selling condominiums at Yosemite West Condominiums. Pursuant thereto, they contributed property, capital and services and agreed to share profits and

losses from the project. They undertook to design, construct and install a reasonably workable water and sewer system and to build and construct condominium buildings and to sell condominium units to the public. In carrying out the purposes of the joint venture, each of the defendants acted as agent for the others."

As first conceived by YWA, the Yosemite West development was to include a residential area, condominiums, hotel, convention center and recreation area. YWA completed the first phase of the development, the home sites, but when it came time to develop the second phase, the condominiums, YWA did not have sufficient financial resources to undertake the project alone. Pursuant to the agreement between YWA and Interwest, YWA was to furnish the land and offsite improvements and Interwest was to construct and sell the condominiums. YWA was not to receive payments under the agreement until the condominiums were actually sold, at which time they were to receive $1,500 per unit sold. As the project continued to develop and each four phases of condominium units were completed, the amount of the payments was to increase.

Both appellants contend that the agreement was for the sale of the property on which Interwest was to build the condominiums, with payment over the long term so that Interwest would have sufficient capital to construct the project. According to appellants, the agreement did not provide for the sharing of profits and losses. However, the agreement provided for much more than the sale of property. Both YWA and Interwest were responsible for the final approval of the drawing of specifications for the building of the condominiums. With the sale of each condominium, Interwest was to deposit $1.25 per square foot of livable space into an escrow account to be used at a later date when YWA and Interwest would use the funds to build the convention center. The agreement itself was ambiguous but, when taken in conjunction with the conduct of both parties, it appears that they envisioned a long-term relationship whereby Interwest would build, sell and manage a condominium complex and convention center on land owned by YWA.

Both agreements with the County recognized YWA and Interwest as the "group" that would develop the condominium project, and both were signatories to the agreements. Both John Doubt, YWA's president, and Robert Sawyer, Interwest's president, worked with the County to promote the project. They appeared jointly before the planning commission and board of supervisors. When Sawyer could not attend, Doubt would attend meetings with County officials. Doubt was designated Interwest's agent for service of process in California according to documents submitted to the DRE, and both participated in the preparation of the report for the DRE.

There was sufficient evidence from which the trial court could conclude that YWA and Interwest were engaged in a joint venture.

## III

### INTERWEST'S RIGHT TO INDEMNIFICATION

Interwest contends that it is entitled to indemnification from YWA for whatever damages it is required to pay as the result of the finding that it is jointly and severally liable for the payment of the condominium owners' annexation fees. This argument is without merit. One who participates in the wrongful act which causes injury is not entitled to indemnity. (*Great Western Furniture Co.* v. *Porter Corp.* (1965) 238 Cal.App.2d 502, 517 [48 Cal.Rptr. 76].)

## IV

### CONTRACT DAMAGES

Interwest's final contention is that to the extent YWA breached its agreement with the County by failing to provide the requisite water supply by the October 1, 1973, deadline, damages cannot be recovered because YWA ultimately complied with this requirement in 1985. Since Interwest was found liable only for annexation fees and was not required to pay any damages resulting from YWA's breach of contract, it is not aggrieved by the judgment and may not raise the issue on appeal. (Code Civ. Proc., § 902.)

The judgment is affirmed. Respondents County of Mariposa, Yosemite West Owners Association and Edward Ringrose et al. are awarded costs on appeal, to be borne jointly by appellants Interwest Corporation and Yosemite West Associates and its related subsidiaries.

Woolport, Acting P. J., and Ballantyne, J., concurred.