[No. F018461. Fifth Dist. Sept. 17, 1993.]

KENNETH W. KIZER, as Director, etc., Plaintiff and Respondent, v. HILLHAVEN, INC., Defendant and Appellant.

**COUNSEL**

Brown & Brown and Sheridan H. Brown for Defendant and Appellant.

Daniel E. Lungren, Attorney General, Charlton G. Holland III, Assistant Attorney General, Dennis Eckhart and Michael V. Hammang, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## FRANSON, J.*—

### INTRODUCTION

In 1988, the Director of Health Services, Kenneth W. Kizer, M.D., M.P.H., (Director), initiated an action against Hillhaven Convalescent Hospital (Hillhaven) pursuant to the Long-Term Care Health, Safety and Security Act of 1973, codified in Health and Safety Code section 1417 et seq. The Director issued Hillhaven a class "AA"[1] citation alleging violations of California Code of Regulations, title 22, section 72311, subdivision (a)(2) (section 72311), and section 72501, subdivision (e). (section 72501).[2]

Section 72311 pertains to nursing services and provides for an individualized care plan to be developed for each patient. Section 73211, subdivision (a)(2) provides specifically that nursing services shall include: "Implementing of each patient's care plan according to the methods indicated. Each patient's care shall be based on this plan."

A care plan indicates the care to be given the patient and outlines the patient's strengths and weaknesses, the objectives to be accomplished and the approaches the staff is to take to achieve those objectives.

### FACTUAL AND PROCEDURAL BACKGROUND

Olan Caldwell (Mr. Caldwell) was an 80-year-old patient at Hillhaven. He was recovering from pneumonia, had suffered a stroke that partially paralyzed his left side, and he suffered from Parkinson's disease, dementia, psychiatric depression and hypothyroidism. Included in Mr. Caldwell's medical records is his care plan prepared pursuant to section 72311. Mr. Caldwell's care plan stated that he needed total care in that he was unable to do activities of daily living. The plan further specified that he needed to be fed. The short-term objective was to have Mr. Caldwell's needs met and to keep him clean. Feeding the patient was one of the approaches to be used.

---

*Retired Presiding Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.

[1]If a violation has presented imminent danger of death or serious physical harm, it is classified as a class "A" violation. If the violation meets the criteria of a class "A" violation and is the direct proximate cause of the death of a victim, the violation becomes a class "AA" citation. (Health & Saf. Code, § 1424.)

[2]Section 72501, subdivision (e) provides: "The licensee shall employ an adequate number of qualified personnel to carry out all the functions of the facility and shall provide for initial orientation of all new employees, a continuing in-service remaining program and competent supervision." The trial court found that Hillhaven was not in violation of this section.

The care plan also indicated that Mr. Caldwell had difficulty swallowing. The short-term objective was to keep him from choking on fluids or food and the approaches outlined were to be sure that he was sitting up when giving him fluids or food, to feed him, to give him enough time to swallow, and to suction as needed. A nurse's weekly progress report stated that Mr. Caldwell had no difficulty swallowing as long as he was being fed slowly.

Mr. Caldwell's feeding skill evaluation stated that he was only able to feed himself 0-10 percent of his meal. There was a note next to that entry which designated Mr. Caldwell as a "feeder." The feeding skill evaluation also noted that he could bring his food to his mouth with frequent spills, that he needed assistance to bring a cup to his mouth to prevent spills, that he was excessively messy when he ate and that he needed continual reinforcement to eat. Nothing in Mr. Caldwell's records indicated that he was being encouraged to feed himself.

On July 27, 1988, approximately 20 days after Mr. Caldwell was released from an acute care hospital after a bout with pneumonia, a nurse assistant positioned Mr. Caldwell at the foot of his bed and placed his lunch tray in front of him. Mr. Robert Nador was working as the temporary nurse assistant that day. Nador was told by another aide that Mr. Caldwell was an "assist" but that all he had to do was set the tray in front of him and then keep an eye on him to make sure he was eating. Nador had done this at breakfast but Mr. Caldwell did not touch his food by himself. Nador went over to feed him breakfast but Mr. Caldwell did not eat much.

At 1 p.m., after Nador placed the lunch tray in front of Mr. Caldwell, he went to feed two other patients. Nador had positioned Mr. Caldwell so that he could see him from about 20-30 feet away through the door of a bathroom that separated Mr. Caldwell from the other patients. Nador occasionally looked through the bathroom door to check on Mr. Caldwell. About 1:10 p.m. Nador saw Mr. Caldwell lifting his spoon to his mouth as if he was slowly eating. The next time Nador saw him at 1:20, Mr. Caldwell was sitting with his head back in his chair and his mouth open. Nador assumed Mr. Caldwell was sleeping. After a few minutes, Nador approached Mr. Caldwell, received no response from him, took his pulse and realized that "something was wrong with Mr. Caldwell." He called the charge nurse.

According to a nurse's progress chart, at 1:34 p.m., another nursing assistant went into Mr. Caldwell's room and found him pale with bluish palms and feet. He was not breathing and did not have a pulse. Mr. Caldwell was put back in bed, the doctor was called and a message was left on an answering machine for the family that Mr. Caldwell had died. Then, during

post mortem care, the nurse noted a whitish formed piece of food on Mr. Caldwell's throat which was suctioned and removed. Dr. Ernoehazy, who performed the autopsy stated that there would not be any reason for Hillhaven staff to have suctioned the patient before transporting the body to the coroner's office.

Dr. Ernoehazy testified that his autopsy showed "below the vocal chords and then extending all the way down into the tertiary and into the left and right main stem bronchi there was food bolus [lump or matter] of pureed food matter which is in the aggregate approximately 30 milliliters." The doctor determined the cause of death to be asphyxiation due to aspiration of food bolus.

Ms. Veronica Russo, a representative of the Department of Health Services, visited Hillhaven on August 11, 1988, to investigate the death of Mr. Caldwell pursuant to a report from Hillhaven and a complaint from the family. Ms. Russo reviewed the medical report and then obtained a copy of that report. She learned from the medical report that Mr. Caldwell was to be fed, that he had difficulty swallowing and that he had a problem with choking.

Ms. Russo consulted her supervisor and then requested an appointment with a licensed physician, Dr. Jacklin. Ms. Russo believed that Mr. Caldwell died while he was eating unsupervised and thus believed that a class "AA" citation should be issued. In order to issue that type of a citation, she had to have permission from her supervisor and a licensed physician. Dr. Jacklin was not available right away. After the meeting with Dr. Jacklin, Ms. Russo continued her investigation. She was told to obtain the medical examiner's report and written declarations of the witnesses for Dr. Jacklin to review before deciding whether to issue a "AA" citation. Ms. Russo issued a notice of intent to issue a class "AA" citation on September 19, 1988. The actual citation was then not issued for over two months. Ms. Russo made a second visit to Hillhaven on October 18, 1988. The hospital administrator, Jay Roberts, told Ms. Russo that he felt Hillhaven was trying to rehabilitate Mr. Caldwell and was trying to allow him to feed himself if that was possible.

In November, Ms. Russo's supervisor gave authorization to issue the citation with a new notice of intent to issue and a statement of deficiencies requiring correction. Hillhaven was served the citation on November 28, 1988. Hillhaven was required to take immediate corrective action because the violation was one which could also endanger other patients. Ms. Russo stated that the second notice of intent was delayed because she was assigned other duties and was out of the office for a two-week period of time.

Hillhaven notified the Director of its intent to contest the citation. The Director then filed a complaint for enforcement of the citation and assessment of penalty pursuant to Health and Safety Code section 1428, subdivision (b). Hillhaven asserted, as an affirmative defense, that the Director had failed to comply with Health and Safety Code section 1423, subdivision (a),[3] which required the Director to serve notice to correct a violation within 24 hours after determining or having reasonable cause to determine that an alleged violation had occurred.

A court trial was held which resulted in the trial judge affirming the citation as to the allegation of a violation of section 72311, subdivision (a)(2). The court did not find a violation of section 72501, subdivision (e). The court further ruled that the Director had not violated Health and Safety Code section 1423. Finally, the court reduced the penalty from $25,000 to $15,000.

Hillhaven filed a timely notice of appeal.

DISCUSSION

I. *The Evidence Supports the Judgment.*

 Hillhaven contends the evidence was insufficient to support the judgment affirming the citation. More particularly, Hillhaven argues that the evidence fails to show that the patient died as a result of its failure to implement Mr. Caldwell's care plan pursuant to section 73211, subdivision (a)(2).

 In examining the sufficiency of the evidence, " '. . . an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding.'

---

[3]Section 1423, subdivision (a) provides in pertinent part: "If upon inspection or investigation the director determines that any nursing facility is in violation of any state or federal law or regulation relating to the operation or maintenance of the facility, or determines that any other long-term health care facility is in violation of any statutory provision or regulation relating to the operation or maintenance of the facility . . . the director shall promptly, but not later than 24 hours, excluding Saturday, Sunday, and holidays, *after the director determines or has reasonable cause to determine that an alleged violation has occurred*, issue a notice to correct the violation and of intent to issue a citation to the licensee. . . . The citation shall be served upon the licensee within three days after completion of the inspection, excluding Saturday, Sunday, and holidays, unless the licensee agrees in writing to an extension of time." (Italics added.)

[Citation.] ¶ It is not enough that there is more evidence against than in favor of a judgment. [Citation.] 'Of course, all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.' [Citation.]" (*County of Mariposa* v. *Yosemite West Associates* (1988) 202 Cal.App.3d 791, 807 [248 Cal.Rptr. 778].)

■■■ Hillhaven contends that putting a tray of food in front of Mr. Caldwell before immediately feeding him did not violate section 73211. However, Mr. Caldwell's care plan did not only say that he was to be fed but also said that he was to be allowed time to swallow and suctioned as necessary. Mr. Nador stated in his declaration that he saw Mr. Caldwell putting food to his mouth and then he did not check on him again for about 10 minutes. Thus, for 10 minutes Nador did not monitor Mr. Caldwell's swallowing or "allow him to swallow" or "suction as needed" as the care plan specified.[4] Dr. Jacklin stated that since the risk of Mr. Caldwell aspirating was very high, an attendant should have been with him. The doctor suggested that Mr. Caldwell had been stuffed with food and then the aide walked away to feed others. Notwithstanding that theory, he concluded that a violation occurred because an attendant was not physically present while Mr. Caldwell was eating.

Dr. Jacklin further stated, "In this case there is no documentation that the patient had trouble with eating if he was fed slowly. And in fact [he] ate about 75 percent of his food. There is no going around since it takes two or three minutes to die that the care giver wasn't there when he needed to be there to suction the patient. And the patient died." Dr. Jacklin indicated that he thought the failure of Hillhaven to implement the care plan caused imminent danger of death or serious bodily harm.

The doctor also opined that the violation was a proximate cause of death. He stated: "[H]ad someone been attending the patient as requested by the nurse and fed him slowly one bite at a time . . . he wouldn't have had his lungs stuffed with food. Now it really doesn't take very much to kill a patient when the food goes down into the lungs and most certainly it can happen by accident sometimes. And it would be particularly apt to happen if the vocal chord was paralyzed. But it wouldn't have filled the patient's lungs."

---

[4]Hillhaven argues that Mr. Caldwell was allowed time to swallow because his physical difficulties allowed him only to feed himself slowly. There was no way, however, that Mr. Caldwell could have suctioned himself. Hillhaven's interpretation of the care plan provisions is not·sound.

Ms. Russo also testified that she believed that the care plan was not implemented because Mr. Caldwell had not been fed by a staff person and he consequently died of asphyxia after aspirating his food.

We conclude the documentary and oral evidence was sufficient to support the issuance of a class "AA" citation for violation of section 73211, subdivision (a)(2). Health and Safety Code section 1423 requires the Director to prove: (1) the violation was a direct proximate cause of death of a patient; (2) the death resulted from an occurrence of a nature which the regulation was designed to prevent; and (3) the patient suffering the death was among the class of persons for whose protection the regulation was adopted.

Because Mr. Caldwell died by choking on his lunch and his care plan required that he be fed and attention be paid to his swallowing problems, the Director proved that the violation was a direct proximate cause of Mr. Caldwell's death. For the same reason, the death resulted from an occurrence of a nature that the regulation requiring the implementation of his care plan was designed to prevent. Finally, Mr. Caldwell was clearly among the class of persons for whose protection the regulation was adopted. (Health & Saf. Code, § 1424, subd. (b).)

Hillhaven's contention is therefore without merit.[5]

II. *The Violation of the Time Requirement of the Citation Issued Pursuant to Health and Safety Code Section 1423 Does Not Entitle Hillhaven to a Dismissal.*

■ Hillhaven contends the Director's action should be dismissed because it failed to comply with the time limitations set out in Health and Safety Code section 1423, subdivision (a). That section provides in relevant part, "[i]f upon inspection or investigation the director determines that a long-term health care facility is in violation . . . the director shall promptly, not later than 24 hours after the director determines or has reasonable cause to determine that an alleged violation has occurred, issue a notice to correct the violation and of intent to issue a citation to the licensee."

The Health and Safety Code's rules of construction provide that ". . . unless the provision or context [of the statute] otherwise requires," "shall" is mandatory and "may" is directory. (Health & Saf. Code, §§ 5, 16.) Thus we must ascertain the legislative intent in using the word "shall" in the notice requirement of Health and Safety Code section 1423, subdivision (a).

---

[5]Given our determination that substantial evidence supports the judgment, we reject the argument that enforcing the regulations amounts to holding Hillhaven strictly liable for Mr. Caldwell's death.

The California Supreme Court has held generally, that ". . . requirements relating to the time within which an act must be done are directory rather than mandatory or jurisdictional, unless a contrary intent is clearly expressed." (*Edwards* v. *Steele* (1979) 25 Cal.3d 406, 410 [158 Cal.Rptr. 662, 599 P.2d 1365].)

"As we recently explained, '. . . the "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates. [Citations.]' (*Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 908, [136 Cal.Rptr. 251, 559 P.2d 606], fn. omitted.) If the failure to comply with a particular procedural step does not invalidate the action ultimately taken, as determined by applying certain tests discussed below, the procedural requirement is referred to as 'directory.' If, on the other hand, it is concluded that noncompliance does invalidate subsequent action, the requirement is deemed 'mandatory.' (*Id.*, at p. 909.)" (25 Cal.3d at pp. 409-410.)

One of the factors to be used in determining the Legislature's probable intent is whether the statute contains a penalty for noncompliance with the time limitations. (*Edwards* v. *Steele*, *supra*, 25 Cal.3d at p. 410.) Health and Safety Code section 1423, states the director is to "promptly" issue a notice to correct the violation and issue a citation only after it "determines or has reasonable cause to determine that an alleged violation has occurred," however, nothing in the language of the section suggests any sort of penalty for delaying the issuance of a citation.

Another factor used in determining probable intent is the determination of whether the consequences of holding the time period mandatory would defeat or promote the purpose of the statute. (25 Cal.3d at p. 410.) Here, the purpose of the statute is to ensure that regulations are followed to maintain the health and safety of patients, that violations are corrected and that facilities are provided incentive to follow the regulations more carefully, through payment of fines in some cases. This purpose would not be served if Hillhaven or other such facilities were allowed to escape accountability or avoid the necessity of correction because of a delay in issuing the notice. A dismissal based on an arguably untimely service of a citation would defeat the purpose of the statute.

Lastly, as the trial judge stated, "Even if there was a violation any prejudice to the defendant would be highly speculative." The delay in this case was not substantial. This is not a case, as Hillhaven contends, which

exemplifies a Director that "issues notices and citations whenever he desires with no applicable statute of limitations." Moreover, the evidence supporting the violation consisted largely of Hillhaven's own records and the testimony of witnesses affiliated with the facility.

In our view, the Legislature intended the provisions of Health and Safety Code section 1423 to be directory, and the failure to comply with them does not negate the court's jurisdiction or the validity of the citation.

### DISPOSITION

The judgment is affirmed. Costs to appellant.

Stone (W. A.), Acting P. J., and Buckley, J., concurred.