[No. D009394. Fourth Dist., Div. One. Oct. 15, 1991.]

SMOKETREE-LAKE MURRAY, LTD., et al., Cross-complainants and Appellants, v.
MILLS CONCRETE CONSTRUCTION COMPANY, INC., et al.,
Cross-defendants and Respondents.

1728

COUNSEL

Hughes & Campbell, John B. Campbell, Horvitz & Levy, David M. Axelrad and Daniel J. Gonzalez for Cross-complainants and Appellants.

Karen J. Hartley, Gibson & Kennerson, Paul R. Kennerson and John K. Grant for Cross-defendants and Respondents.

OPINION

**KREMER, P. J.**—Smoketree-Lake Murray, Ltd., Brehm Construction Company and Forrest W. Brehm (hereafter Developer) appeal a judgment on a cross-claim for indemnification. On appeal, Developer contends the judgment must be reversed because the trial court erred in ruling a fraud finding barred indemnification and failing to find the jury committed misconduct. We reverse.

### FACTS

In 1985, the Smoketree-Lake Murray Owners' Association, Inc., sued Developer and others for damage to their condominium complex. These damages manifested themselves as cracks in walls and slabs, doors which would not close properly, patios which pulled away from buildings and cracks causing leaks in the complex's swimming pool. Developer eventually settled with the Association for over $3 million.

Developer cross-complained for indemnification against various subcontractors including Calego Excavating Company (Calego), which performed

the grading work, and Mills Concrete Construction Company, Inc. (Mills), which did the concrete work. In defense, Mills and Calego contended Developer's fraud, in making misrepresentations and concealing information from the condominium purchasers, barred Developer from obtaining indemnity. Developer also raised a fraud issue, contending the subcontractors had fraudulently induced Developer to enter into narrower indemnity agreements.

The trial court, ruling a finding of fraud would preclude indemnification, bifurcated the trial.

At trial, there was evidence presented that the damage to the condominiums and pool was caused, in part, by soil movement. The soil may not have been properly compacted by Calego or properly tested by Southern California Testing Laboratory (SOCAL), the soils expert hired by Developer. There was also evidence that the concrete slabs were improperly constructed. Among other things, there was evidence that the concrete used was of inadequate quality, contained too much water and that the slabs were poured too thin.

To support the claim Developer made material misrepresentations to the buyers, the subcontractors presented evidence indicating Developer knew at the time he bought the property there were expansive soils on the property which would make development more expensive, the initial soils report originally recommended specially designed footings and slabs but a subsequent report made after discussions with Developer recommended a less expensive alternative of capping the building pads with 2.5 feet of select (nonexpansive) soil; pockets of expansive soils were found in the upper 2.5 feet of some of the building pads but only one building received a reinforced slab; shortly after the concrete slabs were poured, cracks were observed which prompted a report from the soils experts stating the "structural integrity of the foundation system" was threatened; and despite this knowledge, Developer failed to disclose the existence of the expansive soils, the cracks in the concrete slabs or the soils expert's report to the condominium buyers.

In response, Developer presented evidence showing it relied on the recommendations of its experts. Developer reinforced only one slab because SOCAL only recommended reinforcing one slab. Developer had, at SOCAL's recommendation extended the footings in other slabs.[1] Developer presented evidence that the cracks observed in the concrete slabs soon after

---

[1]Mills and SOCAL each paid one-half the cost of the additional concrete work.

they were poured were shrinkage cracks which were monitored over a period of months. Numerous witnesses, including Mills, testified shrinkage cracks normally or regularly occur, are not a matter of concern and do not need to be repaired. The soils expert who had reported the cracks would "have an adverse affect on the structural integrity" testified that was a bad choice of words and he did not believe the cracks actually threatened the structural integrity of the building because they were only shrinkage cracks. A number of experts testified Developer's monitoring of the cracks rather than conducting additional investigation by taking core samples or drilling holes and Developer's eventual conclusion the cracks were due to concrete shrinkage rather than soil subsidence were reasonable and therefore, according to Developer's evidence, Developer did not make any material misrepresentations to the condominium buyers.

DISCUSSION

I

INDEMNIFICATION

■ As we explain below, we hold a jury's finding Developer made misrepresentations to or concealed information from third parties does not negate the express indemnity agreements entered into between Developer and the subcontractors.[2]

### A. The Indemnity Agreements

The parties entered into more than one indemnification agreement.[3] In the original standard form contract between Developer and the subcontractors, an indemnity clause provided:

"Subcontractor does hereby release, and save Contractor harmless, from and against all claims and liabilities of every nature, including but not limited to injury to or death of Subcontractor's employees, attorneys' fees and court costs, directly or indirectly arising from the performance of this agreement, or, arising out of the failure of Subcontractor to comply with Paragraph 33 of this agreement [providing a safe place to work] or from

---

[2]Since we have decided the fraud finding does not preclude enforcement of the express indemnity agreements between Developer and the subcontractors, we need not discuss whether the fraud finding would preclude comparative equitable indemnification; the indemnity rights of the parties are governed by their agreements.

[3]No determination was made below as to whether the agreements were enforceable and, if so, which agreements were controlling.

Subcontractor's liability for failure to provide a 'safe place to work' pursuant to Sections 3300, 6401 and 6406 of the California Labor Code, and from any claims, loss, damage, injury, death or liability however caused or incurred, including injury to or death of Subcontractor's employees, resulting directly or indirectly from the nature of the work covered by this agreement. Such duties to release and save Contractor harmless shall apply to liability incurred or claimed as a result of negligence, regardless of responsibility for such negligence, provided; however, that nothing in this agreement purports to or should be understood to provide for indemnity of Contractor for Contractor's sole negligence or willful misconduct."

In August 1976, Developer individually negotiated agreements with Mills and Calego which contained indemnity clauses and personal guarantees for indemnity.

In the agreement between Mills and Developer, Mills acknowledged "[t]he concrete work performed by Mills on the Property may not have been done in accordance with the plans and specifications provided, the engineer's requirements and the Uniform Building Code." Developer agreed to accept Mills's work and pay as provided by the original agreement and Mills and its two sole shareholders agreed to "indemnify and hold [Developer] harmless from any damage or loss [Developer] may suffer resulting from any failure by Mills to comply with the plans and specifications, engineer's requirements or the Uniform Building Code, including but not limited to all actions, suits, proceedings, demands, assessments, judgments, attorneys' fees, costs and expenses incident thereto."

The agreement between Developer and Calego provided "[t]he grading and excavating work performed by CALEGO on the property was not done in accordance with the plans and specifications" and that Developer would only accept and pay for the work if (1) Calego entered an indemnity agreement, (2) Calego's work was accepted by the city, (3) Developer verified the grading met foundation elevations and agreed banks between buildings and (4) Calego agreed to perform some remedial grading. In the indemnity provision, Calego and its partners agreed to hold Developer "harmless from any damage [Developer] may suffer resulting from any failure by CALEGO to comply with the plans and specifications through the fault of CALEGO including, but not limited to, all actions, suits, proceedings, demands, assessments, judgments, costs and expenses reasonably incident thereto."

### B. The Trial Court's Ruling

The trial court bifurcated the trial ordering the fraud issues be tried before the issues of damages. During the course of the arguments on the issue, the trial court stated:

"It seems to me at this stage that if there is a finding of fraud there is going to be no indemnity.

"Now, if you can brief me on it and talk me out of that, either on an in pari delicto, on some kind of a severing the negligence from the fraud, that makes sense. Because that's an awful harsh rule, an awful harsh rule. But seems to me, when I think about this thing, when a developer in the situation of Brehm finds out about something that he perceives to be a defect, whatever it is, his function in life is not to go to the subs and get an indemnity agreement and not fix it and sell it to the public, who is unaware. If that's what he did, maybe public policy is that he ought to eat it. That's my thoughts on it."

In its instructions to the jury at the outset of the case, before opening arguments were made or evidence was presented, the trial court instructed the jury on the elements of fraud and then explained:

"Now, insofar as the construction developer is concerned, the pivotal—as the evidence comes in, the pivotal question is going to relate to what he knew at the time that he sold the property to the general public. With regards to the subs, the pivotal question is going to be what he knew when he was telling the general what he was doing on the project. So the dates are going to be a little different here."

Throughout the case, Mills and Calego argued the Developer had committed fraud by failing to disclose information to the homeowners.[4] They maintain this position on appeal.[5]

## C. Right to Indemnity

"Indemnity may be defined as the obligation resting on one party to make good a loss or damage another party has incurred. [Citation.]" (Ross-

---

[4]For example, the trial court, at the outset of the trial, told the jury the focus of the case against Developer was based on what Developer knew at the time of the sales of the property to the public, that is, that Developer's fraud was directed at the homeowners. Both Calego and Mills in their opening statements and closing arguments directed the jury's attention to the fraud Developer committed against the homeowners, not to any fraud committed against the subcontractors.

[5]In its brief on appeal, Mills asserts: ". . . MILLS plead, tried and argued its case on a pattern of fraudulent conduct, including nondisclosure and misrepresentation to MILLS (as a substitute for investigation and repairs, and leading to later damages)." Mills cites to the record to support this assertion. While it is true there is some general language in the pleadings regarding Developer's nondisclosures to Mills, Mills's other citations do not show Mills arguing to the jury a pattern of fraudulent conduct committed by Developer against Mills. Mills's argument on appeal focuses on fraud committed by Developer against the homeowners, not on fraud committed by Developer against Mills.

*moor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97]; *Selma Pressure Treating Co.* v. *Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1611 [271 Cal.Rptr. 596].) ■ Indemnity, involving an obligation to an injured third party, is distinct from an exculpatory clause or "exemption" from liability obtained from the injured party. (See *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 48 [41 Cal.Rptr. 73, 396 P.2d 377], disapproved on other grounds as stated in *Bay Development, Ltd.* v. *Superior Court* (1990) 50 Cal.3d 1012, 1030, fn. 10 [269 Cal.Rptr. 720, 791 P.2d 290]; *Guy F. Atkinson Co.* v. *Schatz* (1980) 102 Cal.App.3d 351, 356 [161 Cal.Rptr. 436]; *Lemat Corp.* v. *American Basketball Assn.* (1975) 51 Cal.App.3d 267, 278 [124 Cal.Rptr. 388].) As the court explained in *Lemat Corp.* v. *American Basketball Assn., supra,* 51 Cal.App.3d 267, 278:

"The distinction between an exemption ([Civ. Code,] § 1668) whereby a person seeks to avoid liability to a victim who has suffered due to that same person's unlawful conduct and an indemnity has been recognized by the courts. [Citations.] A public policy consideration exists. An exemption may deprive a victim of compensation for injuries but an agreement to indemnify a person who may be responsible for a loss is additional assurance that the loss will be compensated."[6]

■ The right to indemnification arises from two general sources: "First, it may arise by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified

---

[6]See also *John E. Branagh & Sons* v. *Witcosky* (1966) 242 Cal.App.2d 835, 838-839 [51 Cal.Rptr. 844], where the court stated: "[There is a] distinction between what may be termed a true exculpatory agreement whereby the promisee seeks to avoid liability to the promisor who has suffered damage because of the former's negligence, and an indemnity agreement whereby the promisee seeks to enforce the promisor's agreement to indemnify him if and when a claim is asserted against the promisee. [Citations.] This distinction was recognized in *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40 . . . , wherein the opinion recites: 'Assuming that the agreement provided that Ecco indemnify Clovis from its own negligence, we cannot, however, accept Ecco's contention that such indemnification would violate public policy and therefore fail under the reasoning of *Tunkl* v. *Regents of the University of California* (1963) 60 Cal.2d 92 . . . . Clovis does not seek *exculpation* from liability to Butler but rather *indemnification* from Ecco for such potential liability. The indemnification agreement resembles an insurance agreement; indeed, the real situation here appears to be that Clovis maintains insurance against liability to Butler and Clovis' insurer now attempts to transfer that liability to Ecco and Ecco's insurer.' [Citations.]" And see *Lemat Corp.* v. *American Basketball Assn., supra,* 51 Cal.App.3d 267, 278, where the court stated: "The distinction between an exemption [citation] whereby a person seeks to avoid liability to a victim who has suffered due to that same person's unlawful conduct and an indemnity has been recognized by the courts. [Citations.] A public policy consideration exists. An exemption may deprive a victim of compensation for injuries but an agreement to indemnify a person who may be responsible for a loss is additional assurance that the loss will be compensated."

circumstances. Second, it may find its source in equitable considerations brought into play either by contractual language not specifically dealing with indemnification or by the equities of the particular case. [Citations.]" (*E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 506-507 [146 Cal.Rptr. 614, 579 P.2d 505]; *Bay Development, Ltd.* v. *Superior Court, supra,* 50 Cal.3d 1012, 1029.)

The two types of indemnity are subject to different rules. As the Supreme Court has explained:

"[I]n *E. L. White, [Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497,] we recognized a distinction between an indemnity claim based on an express contract to indemnify, that is, an express contractual indemnity claim, and an indemnity claim based on 'contractual language not specifically dealing with indemnification' [citation], that is, an implied contractual indemnity claim. We explained that, *unlike express contractual indemnity, implied contractual indemnity is a form of equitable indemnity.* [Citation.]" (*Bay Development, Ltd.* v. *Superior Court, supra,* 50 Cal.3d 1012, 1029, italics changed from original, fn. omitted.)

Express indemnity reflects "its contractual nature, permitting great freedom of action to the parties in the establishment of the indemnity arrangements while at the same time subjecting the resulting contractual language to established rules of construction." (*E. L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d 497, 507, fn. omitted.)

"[E]quitable indemnification is a matter of fairness." (*Jaffe* v. *Huxley Architecture* (1988) 200 Cal.App.3d 1188, 1191 [246 Cal.Rptr. 432] [examining comparative equitable indemnification among joint tortfeasors].) ▮ The doctrine of comparative equitable indemnity is applied to multiple tortfeasors and is designed to apportion loss among tortfeasors in proportion to their relative culpability so there will be an equitable sharing of the loss among multiple tortfeasors. (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 595, 597-598 [146 Cal.Rptr. 182, 578 P.2d 899]; *GEM Developers* v. *Hallcraft Homes of San Diego, Inc.* (1989) 213 Cal.App.3d 419, 426 [261 Cal.Rptr. 626].) ▮ Implied contractual indemnity is applied to contract parties and is designed to apportion loss among contract parties based on the concept that one who enters a contract agrees to perform the work carefully and to discharge foreseeable damages resulting from that breach. (*Bear Creek Planning Com.* v. *Title Ins. & Trust Co.* (1985) 164 Cal.App.3d 1227, 1237 [211 Cal.Rptr. 172], disapproved on other grounds in *Bay Development, Ltd.* v. *Superior Court, supra,* 50 Cal.3d 1012, 1031-1032.) ▮ ▮ Both doctrines of implied indemnity rest

on the equities of the circumstances, i.e., tortfeasors sharing loss in proportion to their culpability, contracting parties sharing loss relative to their breach.

■ In contrast, express indemnity rests on the contract of the parties; it is the language of the contract, rather than the equities of the situation which govern. In an express indemnity agreement, the parties may agree to results which would not occur in the absence of an express agreement for reasons other than equally or "fairly" apportioning loss.[7] As one court has observed: ". . . California courts have come to regard indemnity provisions in construction agreements as a generally acceptable method of distributing loss among insurance carriers. [Citation.]" (*Guy F. Atkinson Co.* v. *Schatz, supra,* 102 Cal.App.3d 351, 356.)

■ In interpreting an express indemnity agreement, the courts look first to the words of the contract to determine the intended scope of the indemnity agreement. A key factor in determining the scope of the agreement, is the specificity of the language. An indemnity agreement which is broadly worded and refers only generally to indemnification for claims or losses, is interpreted as providing indemnity, at most, for the indemnitee's passive negligence; to obtain greater indemnity, more specific language must be used. (See *Gonzales* v. *R. J. Novick Constr. Co.* (1978) 20 Cal.3d 798, 809-810 [144 Cal.Rptr. 408, 575 P.2d 1190]; *MacDonald & Kruse, Inc.* v. *San Jose Steel Co.* (1972) 29 Cal.App.3d 413, 419-420 [105 Cal.Rptr. 725].)

The Legislature has also placed limits on the scope of indemnity agreements in construction contracts.[8] ■ Civil Code section 2782 declares indemnity clauses in a construction contract may not provide indemnification for injury or loss due to the indemnitee's sole negligence or sole willful conduct; such provisions are "against public policy and are void and unen- ■ (Civ. Code, § 2782; *C.I. Engineers & Constructors, Inc.* v.

---

[7]See, e.g., *Bay Development, Ltd.* v. *Superior Court, supra,* 50 Cal.3d 1012, 1030, footnote 10: "When parties have not entered into an express indemnification agreement specifying that one party will bear all of the liability for a loss for which both parties may be partially responsible, the principles of *American Motorcycle* support an apportionment of the loss under comparative indemnity principles."

[8]The Legislature has also placed special limits on insurance contracts, specifically prohibiting insurance companies from insuring for intentional tortious or criminal conduct. (See Ins. Code, § 533: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others.") Mills's reliance on *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168] and Mills's argument that Developer's "proposed change in law, affording an intentional wrongdoer with indemnity, would have far-reaching and detrimental consequences in the insurance field as well as for other contractual and equitable obligations" are misplaced; the insurance area is covered by specific statutes.

[9]Civil Code section 2782 provides in pertinent part: "Except as provided in Sections 2782.1, 2782.2, 2782.5, and 2782.6, provisions, clauses, covenants, or *agreements* contained

*Johnson & Turner Painting Co.* (1983) 140 Cal.App.3d 1011, 1018 [189 Cal.Rptr. 824].) "[T]he purpose of the Legislature in passing section 2782, having in view certain language previously uttered by [the Supreme Court] in the case of *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 48-49 . . . , was to insure that an indemnitee would not, by contractual language *however specific*, require indemnity for damages sustained as a result of its *sole* negligence or willful misconduct." (*Gonzales* v. *R. J. Novick Constr. Co., supra*, 20 Cal.3d 798, 809, fn. 8, italics in original.) Civil Code section 2782 does not, however, prohibit agreements for indemnification when the loss or injury is due only in part to the indemnitee's negligence or willful misconduct. (See *C. I. Engineers & Constructors, Inc.* v. *Johnson & Turner Painting Co., supra*, 140 Cal.App.3d 1011, 1018 [holding Civ. Code, § 2782 did not bar indemnity for "conegligence"].)

 Mills and Calego argue the courts have repeatedly denied indemnity to an individual who has participated in the wrongful act causing damages for which they seek indemnity. They cite cases following language in *Great Western Furniture Co.* v. *Porter Corp.* (1965) 238 Cal.App.2d 502 [48 Cal.Rptr. 76]. (See *County of Mariposa* v. *Yosemite West Associates* (1988) 202 Cal.App.3d 791, 815 [248 Cal.Rptr. 778]; *Bear Creek Planning Com.* v. *Title Ins. & Trust Co., supra*, 164 Cal.App.3d 1227, 1237.) In *Great Western Furniture*, the court stated:

"[W]here the right of *implied indemnity* arises from a contractual relationship between the indemnitor and the indemnitee, it is predicated upon the indemnitor's breach of such contract, the rationale of the cases being that a contract under which the indemnitor undertook to do work or perform services necessarily implied an obligation to do the work involved in a proper manner and to discharge foreseeable damages resulting from improper performance *absent any participation by the indemnitee in the wrongful act* precluding recovery. [Citations.] (*Great Western Furniture Co.* v. *Porter Corp., supra*, 238 Cal.App.2d at p. 517, italics added.)[10]

in, collateral to, or *affecting any construction contract* and which purport to indemnify the promisee against liability for damages for death or bodily injury to persons, injury to property, or any other loss, damage or expense *arising from the sole negligence or willful misconduct of the promisee or the promisee's agents, servants or independent contractors* who are directly responsible to contractors who are directly responsible to such promisee, or for defects in design furnished by such persons, *are against public policy and are void and unenforceable*; provided, however, that this provision shall not affect the validity of any insurance contract, workers' compensation or agreement issued by an admitted insurer as defined by the Insurance Code." (Italics added.)

[10]Compare *Bear Creek Planning Com.* v. *Title Ins. & Trust Co., supra*, 164 Cal.App.3d 1227, 1237, where the court in the course of discussing "implied contractual indemnity" quoted from *Great Western Furniture*. Note the holding in *Bear Creek Planning* that implied contrac-

Mills and Calego overlook the fact *Great Western* and the other cases address *implied* contractual indemnity, not the interpretation of an *express* indemnity agreement as is the case here. As we explained above, different rules govern implied and express indemnity. *Great Western Furniture*'s emphasis on "participation in the wrongful act" reflects the equitable underpinnings of implied indemnity; it does not illustrate the interpretation of an express indemnity agreement made by the parties. The Supreme Court has made it clear: "The contention that a claim for *implied* contractual indemnity should be equated with a claim for *express* contractual indemnity cannot be reconciled with case law involving express indemnification clauses in circumstances where both the indemnitor and the indemnitee bear some responsibility for the loss." (*Bay Development, Ltd.* v. *Superior Court, supra,* 50 Cal.3d 1012, 1032, italics in original.)

Mills and Calego argue *County of Mariposa* v. *Yosemite West Associates, supra,* 202 Cal.App.3d 791, 815, is a contractual indemnity case which supports their position the jury's finding of fraud bars Developer's indemnity claim. In the *Yosemite West Associates* case, a developer, Yosemite West Associates (YWA) entered an agreement in 1967 with the County of Mariposa to develop a residential subdivision called "Yosemite West Subdivision, Unit Number One" (Unit #1). YWA agreed to complete all necessary improvements including a water and sewer system and to initiate the formation of Yosemite West Maintenance District. YWA also agreed to indemnify the county for loss, damage or liability due to YWA's performance or nonperformance.

In 1971, YWA entered an agreement with Interwest Corporation of Utah (Interwest) to develop a condominium project next to Unit #1. YWA was responsible for land development, including off-site improvements, while Interwest was responsible for building and selling the condominiums. In 1973, YWA, Interwest and the county entered an agreement where the county approved the condominium project conditioned on, among other things, expansion of the sewer system and development of a well producing 100 gallons of potable water per minute. The water and sewer systems proved defective and inadequate for both Unit #1 and the condominium project. YWA and Interwest were sued by the county, homeowners and condominium association. YWA cross-complained against the county seeking injunctive relief and damages, claiming the county was at fault for not providing the homeowners with necessary services through the maintenance district. Interwest cross-complained against YWA for declaratory relief and indemnity.

---

tual indemnity is not a form of equitable indemnification was rejected by the Supreme Court in *Bay Development, Ltd.* v. *Superior Court, supra,* 50 Cal.3d 1012, 1032, footnote 12.

On appeal, Interwest contended the court erred in not allowing its claim for indemnification against YWA. The appellate court's entire discussion of Interwest's contention is as follows:

"Interwest contends that it is entitled to indemnification from YWA for whatever damages it is required to pay as the result of the finding that it is jointly and severally liable for the payment of the condominium owners' annexation fees [to annex the condominium project to the Maintenance District]. This argument is without merit. One who participates in the wrongful act which causes injury is not entitled to indemnity. (*Great Western Furniture Co.* v. *Porter Corp.* (1965) 238 Cal.App.2d 502, 517 [48 Cal.Rptr. 76].)" (*County of Mariposa* v. *Yosemite West Associates, supra,* 202 Cal.App.3d 791, 815.)

This single, brief paragraph is the basis for the subcontractors' claim a finding of fraud precludes express contractual indemnity. This paragraph makes no mention of express contractual indemnity; its only analysis consists of a paraphrase and citation to a case involving *implied* contractual indemnity. The only express indemnity provision mentioned in the opinion is one between the county and YWA for the development of Unit #1; the decision is silent as to the basis of Interwest's indemnity claim. A logical inference, given the court's citation to *Great Western Furniture,* an implied indemnity case, and the lack of any mention of a contractual agreement for indemnity between Interwest and YWA, is that Interwest's claim was one for implied indemnity. The *Yosemite West Associates* case is not persuasive authority on the enforceability of an express indemnity agreement.[11]

Mills and Calego have not cited nor has our research disclosed any cases holding that parties to an otherwise valid and enforceable contract can escape their promise to indemnify on the basis that some of the damages were due to negligent misrepresentations or nondisclosure of material facts to the injured third parties.[12] Mills and Calego argue as if the jury had returned a finding all the damages were due solely to Developer's fraud and none were due to the subcontractors' own negligence or failure to meet specifications. No such finding was made here. The jury simply returned

[11]Even if we were to assume there was an express indemnity agreement between Interwest and YWA, we would still not find the *Yosemite West Associates* decision to be a persuasive or definitive authority on the scope of express contractual indemnity since its analysis is both conclusory and rests on authority which is not on point.

[12]Two cases (*Baker Pacific Corp.* v. *Suttles* (1990) 220 Cal.App.3d 1148 [269 Cal.Rptr. 709] and *Blankenheim* v. *E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463 [266 Cal.Rptr. 593]) which Calego cites for its assertion the courts have barred indemnification if any fraud is found, do not involve indemnification. They involve exculpatory clauses or releases entered into between the victim of the fraud and the party seeking to avoid liability.

verdicts finding Developer committed fraud while Mills and Calego did not. The critical issue of whether the circumstances requiring indemnification by Mills and Calego occurred, as provided by the agreement of the parties, was not resolved.[13]

Mills and Calego argue the jury's finding of fraud bars Developer's indemnity action because contracts seeking to indemnify for fraud violate public policy and are void. In support of this contention, they cite Civil Code section 1668 which provides:

"All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

First, this section does not apply to express indemnity agreements; it applies to exculpatory clauses, releases or other provisions seeking to obtain an exemption or waiver of liability from the injured party. (*State Farm Fire & Casualty Co.* v. *Eddy* (1990) 218 Cal.App.3d 958, 967 [267 Cal.Rptr. 379]; *Lemat Corp.* v. *American Basketball Assn., supra,* 51 Cal.App.3d 267, 278; *John E. Branagh & Sons* v. *Witcosky, supra,* 242 Cal.App.2d 835, 838; 1 Witkin, Summary of Cal. Law (9th ed. 1987) contracts, §§ 630-633, pp. 568-570.)[14] Second, the contractual provisions here do not purport to provide indemnity for fraud; indemnity is provided for damages other than those due to Developer's sole negligence or misconduct (original agreements) or due to the fault and/or failure of the subcontractors to meet the

---

[13]Mills, in its brief, suggests Developer conceded a finding it had committed fraud would preclude any indemnity when it "acknowledged" during the discussion on bifurcating the trial: "The issue with respect to fraud is the entire case: what occurred during construction, what the parties were told, what was then understood of the condition of the property at the time the units were sold." When viewed in context, it becomes apparent Developer was explaining that proceeding only on the fraud issues would not result in saving time since the evidence relating to the other issues was also relevant to the fraud issues. Developer was not stating the right to indemnity turned solely on fraud.

[14]See *State Farm Fire & Casualty Co.* v. *Eddy, supra,* 218 Cal.App.3d 958, 967, where the court stated: "The crux of the matter lies in the distinction between 'an *exemption* ([Civ. Code,] § 1668) whereby a person seeks to avoid liability to a victim who has suffered due to that same person's unlawful conduct and an *indemnity* . . . .' (*Lemat Corp.* v. *American Basketball Assn.* (1975) 51 Cal.App.3d 267, 278 . . . .)

" . . . . . . . . . . . . . . . . . . . . . . .

" 'If section 1668 applied to agreements to indemnify persons against unlawful acts then *all* agreements to indemnify against violations of the law would be illegal. The distinctions made in [Civil Code] section 2773 and [Civil Code] section 2774 between unlawful acts "thereafter to be done" and an unlawful act already done would be given no effect. Statutes are to be construed as a whole and, when reasonably possible, full force and effect given to all of their provisions. [Citation.]' "

requirements of particular specifications (August 1976 agreements). Finally, Developer is not seeking indemnity for fraud; Developer is seeking indemnity for losses due to negligence and/or failure to meet specifications by Mills and Calego.

Calego argues:

"If Appellants are allowed to pursue their indemnity claims against CALEGO and MILLS despite their fraudulent conduct, a disturbing and dangerous precedent will be set. A developer, aware of problems or defects in his project, will lose all accountability for his failure to disclose or correct these problems. He will be free to fraudulently conceal the problems, knowing that when the problems manifest themselves, he can promptly settle with the homeowners for compensatory and punitive damages, then turn to his subcontractors for indemnity for all damages wrought by his wrongful conduct, regardless of culpability."

A conclusion Developer may seek indemnity under the contract for damages which Mills and Calego agreed to indemnify does not mean they are required to indemnify Developer for damages which are solely due to Developer's fraud; such damages are specifically exempted by the terms of the original agreement and by Civil Code section 2782 and are not provided for in the August 1976 agreements which seek indemnity only for the subcontractors based on the subcontractors' fault or failure to meet specifications. No "disturbing and dangerous" precedent is set by requiring Mills and Calego to indemnify Developer to the extent they agreed for losses for which they are at least partially responsible.

## II

### UNCLEAN HANDS

Calego argues Developer is barred from obtaining indemnification by the doctrine of unclean hands.

■■■ "Traditionally, the doctrine of unclean hands is invoked when one seeking relief in equity has violated conscience, good faith or other equitable principles in his prior conduct. [Citations.]" (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 727 [39 Cal.Rptr. 64].) "The general principle behind the 'clean hands' doctrine is that a court will neither aid in the commission of a fraud by enforcing a contract, nor relieve one of two parties to a fraud from its consequences, where both are in pari delicto." (*Burton* v. *Sosinsky* (1988) 203 Cal.App.3d 562, 573 [250 Cal.Rptr. 33].) "The bar applies only if the inequitable conduct occurred in a transaction directly related to the matter before the

court and affects the equitable relationship between the litigants. [Citations.]" (*California Satellite Systems, Inc.* v. *Nichols* (1985) 170 Cal.App.3d 56, 70 [216 Cal.Rptr. 180].)

As Mills points out, "[t]he traditional defense of unclean hands . . . applies to facts involving only two (2) parties, Plaintiff and Defendant, and one transaction involving both parties."

■■■ Here, in contrast, we have a third party indemnity situation. The fraud does not relate directly to the transaction at issue. The transaction at issue is the indemnity agreement, i.e., whether an indemnity agreement is enforceable against Mills or Calego. There is no claim these agreements were obtained by fraudulent conduct.[15] The fraud at issue was committed on third parties, i.e., the condominium buyers. It occurred after the agreements had been made, after the subcontractors had completed their work and included representations about the work performed by the subcontractors.

Calego argues:

"[Developer's] conduct, which was found by the trial court to constitute fraud, consisted of a pattern of fraudulent behavior that began with the discoveries contained in SOCAL Report No. 9. This course of conduct inextricably intertwined CALEGO, MILLS and the Smoketree-Lake Murray homeowners. Not only did [Developer] fail to disclose material facts to the purchasers of its condominium units, but rather than correct the known deficiencies it ran to its subcontractors to obtain additional assurances of indemnity for the damages that [Developer] almost certainly knew would occur."

This argument ignores several important facts. Developer, Mills and Calego were "inextricably intertwined" because they all worked on the Smoketree-Lake Murray Project; whether the losses were sustained only because of Developer's fraud or for other reasons has not been determined. Additionally, this case was tried on a theory Developer made misrepresentations to the condominium buyers, not that Developer made misrepresentations to the subcontractors when it obtained the indemnity agreements in

---

[15]Compare *Burton* v. *Sosinsky, supra,* 203 Cal.App.3d 562, where the unclean hands doctrine was applied to prevent a subcontractor who had committed fraud from enforcing a mechanic's lien against the individual who had been defrauded and *Pond* v. *Insurance Co. of North America* (1984) 151 Cal.App.3d 280 [198 Cal.Rptr. 517], where the unclean hands doctrine was applied to prevent an insurance agent who had failed to disclose information to the insurance company in prior litigation from later suing the insurance company for malicious prosecution.

August 1976. In the August 1976 indemnity agreements, both Mills and Calego specifically acknowledged their work might not have been done in accordance with the plans and specifications and agreed to indemnify Developer for losses due to their fault or failure to meet plans and specifications; thus they specifically acknowledged that losses might occur in the future because their work was not correctly performed. Finally, the argument ignores the fact that even if the August 1976 agreements were infected by fraud, the parties would be bound by the earlier (apparently broader) pre-fraud indemnity agreements contained in the original contracts.

We conclude the doctrine of unclean hands does not bar enforcement of · the indemnity agreements.

### III

#### JUROR MISCONDUCT

Developer contends the trial court erred in denying its motion for a new trial based on juror misconduct. Developer contends: (1) one of the jurors committed prejudicial misconduct by performing an experiment on pouring concrete and (2) the jurors improperly modified one of the fraud instructions. We find merit to Developer's first contention and conclude the juror's experiment requires reversal. As to Developer's second contention, we do not find it provides a ground for impeaching the verdict since the claimed misconduct goes to the heart of the deliberative process, i.e., the mental process of the jurors, and is a "deliberative error" rather than "misconduct."

Code of Civil Procedure section 657 provides "a new trial may be granted where the substantial rights of a party are materially affected by misconduct or irregularity in the proceedings of the jury." (*Tapia* v. *Barker* (1984) 160 Cal.App.3d 761, 765 [206 Cal.Rptr. 803].)

Under Evidence Code section 1150, subdivision (a),

"Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

■ The Supreme Court has explained, "[t]he only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict . . . are those open to sight, hearing, and the other senses and thus subject to corroboration. [Citations.]" (*People v. Hutchinson* (1969) 71 Cal.2d 342, 350 [78 Cal.Rptr. 196, 455 P.2d 132], cert. den. 396 U.S. 994, 24 L.Ed.2d 457, 90 S.Ct. 491.) The "distinction between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved, . . . has been the basic limitation on proof set by the leading decisions allowing jurors to impeach their verdicts. [Citations.]" (*Id.* at p. 349.)

■ As we explained in *Ford v. Bennacka* (1990) 226 Cal.App.3d 330, 333-334 [276 Cal.Rptr. 513]:

"[Evidence Code s]ection 1150 'does not envision a procedure whereby a trial judge, as a result of a claim of jury misconduct, reviews a "replay" of the particular language used by various jurors as they deliberated and makes a subjective determination of its propriety. Such a procedure would be too great an extension of the court's limited authority to invade the traditionally inviolate nature of the jury proceedings.' [Citation.] 'If there is one thing which is clear from the language of Evidence Code section 1150 and the case law dealing with the subject, it is that the mental processes of the jurors are beyond the hindsight probing of the trial court.' (*Maple v. Cincinnati, Inc.* (1985) 163 Cal.App.3d 387, 394 . . . .)"

■ Jury misconduct raises a presumption of prejudice, and unless the presumption is rebutted, a new trial should be granted. (*In re Stankewitz* (1985) 40 Cal.3d 391, 402 [220 Cal.Rptr. 382, 708 P.2d 1260].) "In reviewing the denial of a motion for new trial based on jury misconduct, the appellate court 'has a constitutional obligation [citation] to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial.' [Citations.]" (*Tapia v. Barker, supra,* 160 Cal.App.3d 761, 765.)

### A. Experiment by Juror Rizzo

■ Juror Rizzo used a small box, filled with "kitty litter," and some crayons to demonstrate how concrete was poured.[16] In conducting the dem-

---

[16]In her declaration, Rizzo stated: "On the first day of deliberations, October 13, 1988, the jurors talked about how the slabs were built. One of the jurors, Diane, drew a picture of the forms for a slab, and looking around there were quite a few of the jurors who said and showed that they did not understand. So, three o'clock the next morning, I woke up and it came to me

onstration, Rizzo explained she knew about concrete construction practice from discussions with her family. In the course of the demonstration, Rizzo told the jury "how the inconsistencies in the sand—on top of which the concrete is placed—can be caused by the footprints of people walking back and forth across the building pad before the concrete is poured."

 It is well established it is misconduct for a juror to conduct an independent investigation of the facts, to bring outside evidence into the jury room, to inject his or her own expertise into the jury's deliberation or to engage in an experiment which produces new evidence. (See *People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]; *People* v. *Martinez* (1978) 82 Cal.App.3d 1, 21 [147 Cal.Rptr. 208], disapproved on other grounds in *DeLancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142]; *People* v. *Cooper* (1979) 95 Cal.App.3d 844, 853-854 [157 Cal.Rptr. 348].)

Our Supreme Court has explained:

"[The jury] may carry out experiments within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope of purview of the evidence, then, manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain." (*Higgins* v. *L. A. Gas & Electric Co.* (1911) 159 Cal. 651, 657 [115 P. 313].)

---

in my sleep I guess, how the forms look for a slab. So I got a small cardboard box, which my checks come in, and filled it partially with kitty litter and some broken crayolas. That morning I brought in with me a newspaper and my box of kitty litter and a box of crayolas. When we started to deliberate again, I asked for the floor. I asked if I may show them, like a show and tell, as to the picture that Diane had drawn. There were no objections.

"I then stated several times that this was in no way evidence for or against any one person, and there was no objections. So then I spread the paper on the table (didn't want to spill cat litter on table) and opened the box and took out the crayolas and I smoothed out the cat litter and the difference from the top of the box to where the cat litter was, I said that we would assume that this was the forms for the slab, and that the outside of the box we would say, that that was the trenches for the foundation. Then I said that the plumbers and/or other people that had to do anything to the ground before the slabs were poured, the plumbers would dig a trench for their pipes. So then I laid the crayolas down as the plumber's pipes and I had a couple of them sticking up above the forms and after this was done, they had to wait for the city inspector. And when the inspector passed the plumbing and the forms, then either the plumbers or someone else would come in and fill up the plumbing trenches and then they would come in and pour the slabs."

Cases which have held jury experiments did not require reversal include *People* v. *Cooper, supra,* 95 Cal.App.3d 844, and *Locksley* v. *Ungureanu* (1986) 178 Cal.App.3d 457 [223 Cal.Rptr. 737].[17]

In *Cooper,* the jury conducted an experiment on the way the defendant had thrown some contraband drugs. The court found no misconduct, explaining:

"The experiment in the present case did not result in the generation of new evidence. [Citation.] During the trial, Officer Rowe had demonstrated the manner in which defendant had thrown the contraband. The jurors simply repeated the officer's reenactment. Nothing requires that the jury's deliberations be entirely verbal, and we would expect a conscientious jury to closely examine the testimony of the witnesses, no less so when that testimony takes the form of a physical act. There was no error in denying the motion for new trial on this ground." (*People* v. *Cooper, supra,* 95 Cal.App.3d 844, 854.)

In *Locksley,* the defendant driver in an automobile accident case was blind in one eye. Two of the jurors conducted an experiment by driving with one eye closed. The court assumed the experiment constituted misconduct and concluded the trial court acted within its discretion in finding the misconduct (if any) was not prejudicial.

Cases where the courts have found jury experiments to be prejudicial misconduct include *People* v. *Conkling* (1896) 111 Cal. 616 [44 P. 314] and *People* v. *Castro* (1986) 184 Cal.App.3d 849 [229 Cal.Rptr. 280].

In *Conkling,* a murder case, two jurors, to satisfy themselves at what distance a rifle discharge would leave powder marks on cloth, took a rifle from the courtroom and experimented with it. The court reversed because the jury had obtained evidence "by unauthorized experiments made without the presence and knowledge of the defendant." (*Higgins* v. *L. A. Gas & Electric Co., supra,* 159 Cal. at p. 659.) The court explained:

"The distance between the deceased and defendant at the time of the fatal shot was fired was a vital issue in the case. The clothing worn by the deceased was in evidence, and when exhibited to the jury showed no powder marks. . . . [The defendant's] affidavits [showed] that during the progress

---

[17]See also *Wagner* v. *Doulton* (1980) 112 Cal.App.3d 945 [169 Cal.Rptr. 550], involving the drawing of a diagram of an accident scene by a juror who was also an engineer. The court found no misconduct because the diagram was based solely on the information presented during the trial and no new evidence based on special expertise had been brought in by virtue of the fact the juror, as an engineer, may have been more skillful in drawing than the average person.

of the [trial] two of the jurors borrowed a rifle similar to that with which the deceased was killed, bought some cotton drilling, retired to the outskirts of the city, and there made experiments by firing the rifle, for the purpose of determining at what distance powder marks would be carried by the fire . . . . [The jurors] were evidently honest, and desirous of getting at the truth of the matter; but they were too zealous, and their misconduct in this particular demands a retrial of the case. Jurors cannot be permitted to investigate the case outside the courtroom. They must decide the guilt or the innocence of the defendant upon the evidence introduced at the trial. It is impossible for this court to say that this outside investigation did not affect the result as to the character of the verdict rendered. For, when misconduct of jurors is shown, it is presumed to be injurious to defendant, unless the contrary appears. [Citations.]" (*People v. Conkling, supra,* 111 Cal. at pp. 627-628.)

In *People v. Castro, supra,* 184 Cal.App.3d 849, a juror, at home, used a pair of binoculars to see if a prison guard who testified at trial could have seen what he claimed through a pair of binoculars. The court concluded this constituted prejudicial misconduct. In reaching this conclusion, the court turned to *People v. Martinez, supra,* 82 Cal.App.3d 1, where the court stated the right to a fair trial includes the right to an unbiased jury. ▮ Following *Martinez,* the *Castro* court found the question of whether jury misconduct in receiving evidence outside of court injured a defendant depended on: "(1) whether the jury's impartiality has been adversely affected; (2) whether the [plaintiff's] burden of proof has been lightened, and (3) whether any asserted defense has been contradicted. 'If the answer to any of these questions is in the affirmative, the defendant has been prejudiced and the [judgment] must be reversed.' [Citation.]" (*People v. Castro, supra,* 184 Cal.App.3d at p. 856, italics omitted.)

The *Castro* court explained why it concluded the binocular experiment constituted prejudicial misconduct:

"Applying the *Martinez* standard of review, it becomes obvious that [the juror's] experiment affected his own impartiality, it lessened the prosecution's burden of proof, and it contradicted appellant's defense that he was not the inmate who threw the burning mop into the maintenance building.

"The very integrity of the jury deliberative process is at stake here. A juror conducted his own experiment at home which inferentially affected his verdict thereby creating a rebuttable presumption of prejudice. Because the prosecution failed to rebut the presumption and because the record does not permit a finding of harmless error, the judgment of conviction must be reversed." (*People v. Castro, supra,* 184 Cal.App.3d at p. 857.)

Here, unlike the *Cooper* case where the jurors merely duplicated a demonstration presented at trial, Rizzo presented a new demonstration (i.e., there was no kitty litter and crayola demonstration conducted by any of the experts in the case). ▮ ▮ ▮ Further, when Rizzo conducted the demonstration, she represented she had special knowledge about concrete practices from family members, a situation very different from the *Locksley* and *Wagner* cases.[18] ▮ Rizzo additionally presented new evidence that inconsistencies in the sand on top of which the concrete is placed can be caused by the footprints of people walking back and forth across the building pad before the concrete is poured. Developer had no opportunity to challenge the accuracy of Rizzo's demonstration nor her representations of special knowledge about concrete practices.

The trial judge here found the experiment did not require reversal, concluding: "Seems to me that the demonstration, if it were misconduct, in light of the findings of fraud, no fraud to the subs prior to that time, just is misconduct out in the air, doesn't mean anything." This statement reflects the court's belief the demonstration was relevant only to the issue of whether the subcontractors had committed fraud, an issue which the juror declarations uniformly indicated had been resolved the previous day by a vote finding neither Calego nor Mills had committed fraud. But the demonstration was also relevant to whether Developer had committed fraud, i.e., whether the deficiencies in the concrete, including the fact that the slabs were poured too thin, were due to Developer's fault rather than the fault of the subcontractors.[19]

We conclude Rizzo's demonstration constituted misconduct because it brought new evidence into the deliberations. The presumption of misconduct was not rebutted. Therefore, the finding of fraud against the Developer must be reversed.

---

[18]Mills contends Developer waived any objections to Rizzo's special knowledge because she "explained in voir dire that she had knowledge of concrete work or 'cement,' " describing her father's knowledge in general terms and "[m]ost importantly, she was not asked about other family members," particularly nothing about her brother-in-law who had worked for one of the subcontractors on the Smoketree project. First, Developer's claim of juror misconduct is not based on Rizzo concealing special knowledge or bias but on her conducting a demonstration and bringing in new evidence. Further, the record indicates during voir dire, Rizzo, an accountant, when asked if she had "[a]ny knowledge of concrete work," answered: "Just cement. My father was like a handyman. He plastered outside of houses and did repair work on cabinets and stuff, and when we were children, we used to help him." This statement did not hint at Rizzo's knowledge about concrete work in construction projects nor her brother-in-law's employment by one of the Smoketree subcontractors. This record does not support Mills's waiver theory.

[19]Note that one of the jurors in her declaration stated Rizzo told the jurors "that the concrete subcontractors would normally not know how the dirt was placed inside their forms before the concrete was later poured—and that it was [Developer's] fault that the concrete turned out the way it did."

## B. *Alteration of Instructions*

■ Developer contends the jurors committed misconduct by modifying and misapplying an instruction on fraud in the inducement and as a result erroneously concluded Developer had committed fraud.

Since we have concluded the Rizzo experiment was prejudicial misconduct, we need not decide whether jurors committed additional misconduct by modifying an instruction. We further note the claimed jury "misconduct" here does not involve matters extrinsic to the deliberative process; rather it is intrinsic to the deliberative process. The situation here is similar to that we recently considered in *Ford* v. *Bennacka, supra*, 226 Cal.App.3d 330, 336. In *Ford*, we found declarations that the jurors had confused the instructions on the plaintiff's burden of proof and on comparative negligence were not admissible.[20] We stated:

"The declarations do not suggest any juror violated the court's instruction to follow the law by recounting his or her own outside experience on a question of law. [Citations.] The declarations do not describe overt acts, statements, or conduct showing the jury intentionally agreed to disregard applicable law and apply inapplicable law. [Citation.] Instead, *the declarations at most suggest 'deliberative error'* in the jury's collective mental process—confusion, misunderstanding, and misinterpretation of the law. On this record the court correctly declined to admit the proffered juror declarations to impeach the verdict. [Citations.]" (*Id.* at p. 336, italics added.)

Similarly, here we have, at most, a "deliberative error." (Contrast *Tapia* v. *Barker, supra*, 160 Cal.App.3d 761, where juror discussions showed jurors considered reducing the judgment based on outside evidence of a collateral source of income as well as the fact a juror had an improper, unrevealed bias against the plaintiff's Mexican background.) On this issue, the declarations do not reveal the use of any outside evidence or resort to outside legal authority. The declarations indicate, at most, confusion or misunderstanding by the jury in the process of deliberating, in determining how to reach a verdict using the instructions given to them by the court. This error is not the type that can be used to impeach a verdict.

### DISPOSITION

The judgment is reversed. Developer to recover its costs.

Benke, J., and Nares, J., concurred.

A petition for a rehearing was denied November 4, 1991, and respondents' petition for review by the Supreme Court was denied January 29, 1992.

---

[20]The juror declarations indicated the jury reached a consensus that each side was 50 percent negligent and believed they thus had to return a verdict in the defendant's favor.