Filed 11/9/22  San Jose Water Co. v. Brightview Landscape Services CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SAN JOSE WATER COMPANY,<br><br>    Cross-Complainant and Appellant,<br><br>v.<br><br>BRIGHTVIEW LANDSCAPE SERVICES, INC.,<br><br>    Cross-Defendant and Respondent. | H049017<br>(Santa Clara County<br>Super. Ct. No. 18CV330562) |

When a neighbor sued for personal injury due to debris from one of its trees, defendant San Jose Water Company (SJWC) filed a cross-complaint for indemnity against cross-defendant BrightView Landscape Services, Inc. (BrightView), which was contracted to provide landscaping and tree care services on behalf of SJWC.

The trial court granted BrightView's motion for summary judgment and, in the alternative, summary adjudication of SJWC's first amended cross-complaint, on the ground that Brightview had no obligation under its contract to defend or indemnify SJWC for the neighbor's injury.  SJWC appeals from the ensuing judgment.

We conclude that BrightView has met its initial burden and SJWC has failed to raise any issue of triable material fact regarding BrightView's indemnity obligation arising from the contract between the parties.  Accordingly, we affirm.

## I. BACKGROUND

### A. *Complaint*

In June 2018, plaintiff Carole Adams sued defendants Cabernet Vineyards Homeowners Association (Cabernet), SJWC, and Community Management Services, Inc. Her complaint set forth two causes of action: (1) premises liability; and (2) negligence. Adams alleged that she was injured when she tripped on debris that had fallen from nearby trees onto a walkway near the front of her residence at the Cabernet property. She alleged the trees had been overgrown for a long period of time before the incident and the defendants had failed to act reasonably to remove the hazards, inspect the premises, or warn pedestrians.

### B. *First Amended Cross-Complaint*

The following year, SJWC filed the operative first amended cross-complaint (cross-complaint), pleading the following causes of action: (1) comparative indemnity; (2) declaratory relief; (3) equitable indemnity; (4) equitable contribution; and (5) breach of contract of express indemnity. SJWC alleged that BrightView had a duty to defend and indemnify SJWC against the Adams complaint, under theories of both equitable and express indemnity.

### C. *The Parties' Motions*

In August 2020 (with an amended notice on September 16), BrightView filed a motion for summary judgment and, in the alternative, summary adjudication, contending that it had no duty to inspect or trim the trees giving rise to the underlying lawsuit against SJWC. The next month, SJWC moved for summary adjudication of its second cause of action for declaratory relief, seeking to compel BrightView to comply with its alleged duty to defend SJWC against Adams's claims.[1]

---

[1] SJWC's opening brief only addresses and asks for relief regarding BrightView's motion for summary judgment. SJWC's motion for summary adjudication is not before us in this appeal.

The following evidence was before the trial court on these motions:[2]

On July 6, 2016, Adams tripped and injured her ankle while walking in a common area walkway of the Cabernet community where she was a resident. She tripped on debris that had fallen onto the walkway from overgrown and encroaching trees located on SJWC property.

BrightView (formerly Valley Crest Companies) and its predecessors have provided tree care services to SJWC for over 35 years. BrightView also provides tree care services to Cabernet. At the time of Adams's injury, BrightView and SJWC were parties to a Master Services Agreement (Agreement), which provided that BrightView would provide SJWC with "[l]andscaping and tree care services." The Agreement also provided that BrightView "shall perform the services described in each work order executed by [SJWC] from time to time substantially in the form attached hereto as Attachment A."

BrightView provided tree care services for Cabernet on a yearly basis. The yearly inspection would include a proposal containing identified issues and would be presented to Cabernet's community manager and then the Cabernet board for approval. Cabernet could have any additional needs beyond the yearly inspection addressed by contacting Brent Wahlberg, an account manager for BrightView, who was the account manager for both Cabernet and SJWC at the time of the incident.

The Cabernet property was bordered by SJWC's Williams Station. Tom Vais is the facilities supervisor for Williams Station. Vais makes final determinations as to landscaping and tree maintenance for SJWC, but he has no training identifying safety hazards posed by trees or identifying when trees need to be cut. Vais is the only person

---

[2] We take the following facts from the parties' separate statements of undisputed facts, evidence admitted in conjunction with the motion for summary judgment, and admissions in the parties' briefs. (See *Thompson v. Ioane* (2017) 11 Cal.App.5th 1180, 1186, fn. 4.)

3

responsible for landscape and tree care issues at 150-175 separate SJWC locations and was the only one with the duty to oversee landscaping at Williams Station. Between 2014 and 2017, Vais had no regularly scheduled visits to inspect Williams Station.

Before the inception of the Master Services Agreement, SJWC had received a proposal from Valley Crest which stated: "We are committed to being pro-active rather than re-active in our management of your landscape. We will email reports that include finding of faulty irrigation parts, damaged plants, turf or trees." One of the services that Valley Crest proposed it would provide was to "[w]alk the various sites with you to continually be aware of your priorities." Vais never did any walkthroughs of Williams Station with Valley Crest.

Wahlberg testified at his deposition that there was no recurring scheduled inspection at Williams Station. Tree care issues would generally be handled at the request of SJWC; SJWC made requests approximately six times a year. Vais likewise stated in his deposition that tree care would be performed at Williams Station only in response to a specific request for tree care. He also stated that when a need for tree care services was brought to his attention, he would contact BrightView "to assess the situation and take [the] proper course of action" and that the overhanging tree condition was one he would have expected Cabernet to bring to SJWC's attention. Wahlberg testified that prior to June 2016, he never went to Williams Station to inspect the area adjacent to the Cabernet property.

On June 27, 2016, Wahlberg conducted his annual inspection of the Cabernet property. During the inspection, Wahlberg was told by someone from Cabernet that there was a problem with overhanging trees growing into the Cabernet property. Wahlberg told the person that he would contact SJWC to recommend that the trees be trimmed back, reduced, or removed. Wahlberg testified that when he contacted Vais to notify him about the overhanging trees, Vais told him to go ahead and take care of it and to put it

4

into his schedule. The tree trimming was completed on August 10, 2016, at the direction of, and paid by, SJWC.

The Agreement between the parties contains an indemnity provision. Paragraph 7(a) of the Agreement provides: "To the fullest extent permitted by law, Contractor shall defend, indemnify and hold the Company and its agents, directors, officers, employees, parent company, attorneys, affiliates, subsidiaries, representatives, independent contractors, insurers, assigns and successors harmless from and against all claims, demands, losses, expenses, or liability, including attorneys' fees, *arising, directly or indirectly, from or in connection with the performance of the Services under this Agreement*, whether or not such claims, demands, or liability are caused by Contractor, Contractor's agents or employees, or subcontractors employed on work hereunder, their agents or employees, or products installed by Contractor or subcontractors under this Agreement, except to the extent such claims, demands, losses, expenses or liability are caused by the sole negligence, active negligence or willful misconduct of the Company, or arise from defects in designs furnished by the Company. Such indemnity shall extend to claims, demands, losses, expenses and liability for damage or injuries occurring after completion of work under this Agreement arising out of the performance of such work." (Italics added.)

Three years after the accident, SJWC demanded that BrightView defend and indemnify SJWC for the claims made in Adams's Complaint. BrightView has refused.

## C.    *Trial Court Order*

Following a hearing, the trial court issued an order on January 29, 2021. The court first discussed SJWC's motion for summary adjudication. It examined section 7(a) in the Agreement to determine whether SJWC's claims were "embraced by the indemnity." The court concluded that Adams's claims did not arise, directly or indirectly, from or in connection with BrightView's performance of its services under the Agreement. It noted that, although the Agreement stated that BrightView was retained to perform landscaping

5

and tree care services, the Agreement did not specify what services were to be provided and where. It stated further that BrightView provided unrebutted evidence that it was not allowed to perform its own inspections of SJWC property and that, even after BrightView contacted SJWC about the overgrown trees in late June 2016, SJWC did not authorize trimming until early August 2016, after the injury had occurred. The court therefore denied the motion for summary adjudication on the issue of the duty to defend.

With regard to BrightView's motion, the court granted summary judgment. As to the equitable indemnity claim, the court noted there was an express indemnity provision governing the relationship between the parties that displaced any implied rights. The court also concluded that BrightView had no obligation to inspect and trim the trees on SJWC's property that were adjacent to Cabernet, other than upon SJWC's express request. The court stated that Wahlberg was never asked by SJWC to inspect the trees lining the Cabernet property and was never asked to trim the trees prior to Adams's injury.

On March 15, 2021, the trial court issued a judgment based on the court's order granting BrightView's motion for summary judgment. SJWC timely appealed.

## II.    DISCUSSION

On appeal, SJWC argues that the trial court based its ruling on factual findings unsupported by the evidence—(1) that "[BrightView] has provided unrebutted evidence that it was not allowed to perform its own inspections of SJWC property, but rather had to wait for a SJWC representative to contact it before it could do work"; and (2) that "after [BrightView] contacted SJWC about the Tree in late June 2016, SJWC did not authorize trimming until early August 2016—i.e. after [Adams's] injury occurred." SJWC argues that the evidence establishes that BrightView independently identified tree care needs for SJWC and recommended services, and that there is no evidence showing when Wahlberg notified SJWC of the condition of the tree and recommended that it be trimmed. SJWC contends therefore that there are triable issues of fact regarding whether

6

BrightView's identification of tree care needs and recommendations regarding trimming and maintenance are encompassed by the Agreement, whether BrightView undertook a duty to rectify the condition of the tree when it promised Cabernet that it would, and whether BrightView's negligent delay in trimming the tree indirectly or directly caused or contributed to Adams's injuries.

We conclude that BrightView had no affirmative duty under the Agreement to inspect for and correct the dangerous condition created by the overhanging trees and that it met its initial burden of establishing that Adams's injury did not arise out of and was not connected to BrightView's provision of services under the Agreement.

## A.     *Legal Principles and Standard of Review*

A party moving for summary judgment must meet two separate burdens. First, a "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.) That party also "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*) Unlike the burden of production, the burden of persuasion never shifts. (*Ibid.*)

"In reviewing an order granting summary judgment, we review the entire record de novo in the light most favorable to the nonmoving party to determine whether the moving and opposing papers show a triable issue of material fact." (*Genisman v. Carley* (2018) 29 Cal.App.5th 45, 50.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037; *Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

7

Indemnity is "the obligation resting on one party to make good a loss or damage another party has incurred." (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 628 (*Rossmoor*).) Generally, it may arise from "express contractual language establishing [the] duty" or from "equitable considerations brought into play either by contractual language not specifically dealing with indemnification or by the equities of the particular case." (*E. L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 506-507 (*E. L. White*).) "Each of these two basic forms of indemnity is subject to its own distinctive legal rules and limitations." (*Ibid.*)

"The duty to defend arises if a lawsuit creates 'a potential for indemnity,' that is, a potential for liability of a sort covered under the policy. [Citation.] If there is no possibility of such liability, then there is no possibility of coverage and no corresponding duty to defend." (*All Green Electric, Inc. v. Security National Ins. Co.* (2018) 22 Cal.App.5th 407, 413.) We accordingly focus on BrightView's potential for indemnity under the Agreement.

## B. *BrightView's Duty of Indemnity*

In its moving papers, BrightView argued that it owed no duty to Adams or SJWC to trim or inspect the trees encroaching on the Cabernet property. To the extent that BrightView's arguments related to general negligence and equitable principles, these have no application here, because the parties are bound by an express indemnity contract. With an express indemnity contract, the scope of any duty to indemnify is defined by the contract itself and not from the independent doctrine of equitable indemnity. (See *E. L. White*, *supra*, 21 Cal.3d at p. 508; *Rossmoor*, *supra*, 13 Cal.3d at p. 628 [where the parties have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract].) "In an express indemnity agreement, the parties may agree to results which would not occur in the absence of an express agreement for reasons other than equally or 'fairly' apportioning loss." (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1737, fn.

8

omitted (*Smoketree*).) Further, "an express indemnity clause is accorded a certain preemptive effect, displacing any implied rights which might otherwise arise within the scope of its operation." (*E. L. White*, *supra*, 21 Cal.3d at pp. 507-508.) Similarly, because the first, third, and fourth causes of action are based on equitable principles, these are preempted by the agreement and are subject to summary adjudication on that basis alone. (See *Smoketree*, *supra*, 234 Cal.App.3d at pp. 1736-1737 [doctrines of implied indemnity rest on the equities of the circumstances].) Consequently, we will limit our focus to the scope of BrightView's indemnity duty as defined by the Agreement, and the second and fifth causes of action.

The indemnity clause in the Agreement provides that BrightView shall both defend and indemnify SJWC for claims "arising, directly or indirectly, from or in connection with the performance of the Services under [the] Agreement . . . except to the extent such claims . . . are caused by the sole negligence, active negligence or willful misconduct of [SJWC]." Based on this language, for BrightView to have an indemnity obligation, a claim must (1) arise out of the performance of "Services" as defined in the Agreement and (2) not be caused by SJWC's sole or active negligence. Our analysis turns on the first on these elements.

The Agreement provides that BrightView "shall perform the services described in each work order executed by [SJWC] and [BrightView] from time to time . . . substantially in the form attached hereto as Attachment A." "Services" are defined in Attachment A as "[l]andscaping and tree care services." Attachment A is a "Form of Work Order."

BrightView's evidence shows that it did not undertake the tree trimming until August 10, 2016—after Adams was injured. Although SJWC characterizes this fact as "disputed," SJWC identifies no contrary evidence that might manifest any real factual dispute. There is therefore no basis to conclude that it was BrightView's trimming of the tree that produced the debris to which Adams attributes her injury. The question

9

remaining is whether the Agreement obligated BrightView to perform "services" that it failed to perform.

The parties disagree as to whether the Agreement required Bright View to be "proactive" in inspecting and correcting any dangerous conditions related to the trees at Williams Station. "The precise meaning of any contract . . . depends upon the parties' expressed intent, using an objective standard. [Citations.] When there is ambiguity in the contract language, extrinsic evidence may be considered to ascertain a meaning to which the instrument's language is reasonably susceptible." (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 21.)

The Agreement itself provides no express definition of BrightView's "[l]andscaping and tree care" services. But paragraph 1 of the Agreement provides in relevant part: "Contractor shall perform the services described in each work order executed by the Company and Contractor from time to time (each a 'Work Order[']) substantially in the form attached hereto as **Attachment A** (the 'Services')." And "each Work Order . . . shall constitute authorization to proceed." This indicates that the specifics of the "landscaping and tree care" services BrightView is to perform would be defined in each work order "from time to time" (i.e., when the parties agreed on work that needed to be completed). Accordingly, under the terms of the Agreement, it is the issuance of a work order that authorizes BrightView to perform.

SJWC identifies no contrary language in the Agreement that would support its contention that BrightView had an ongoing duty under the Agreement to inspect for and correct dangerous conditions caused by trees. Indeed, the Agreement also states that SJWC "is free to seek similar services from other service providers during the term of this Agreement without being deemed in breach of the Agreement": it would not be necessary for SJWC to have the option to seek other contractors to perform tree services if BrightView were generally already obligated to perform continuous tree work.

10

Even if we were to find the language of the Agreement to be ambiguous, extrinsic evidence of the parties' expectations and conduct supports BrightView's position that it was only obligated and authorized to perform work upon receiving a work order. (Code Civ. Proc., § 1856, subd. (c) [the terms of a contract may be explained or supplemented by course of dealing or course of performance].)

BrightView's agent, Wahlberg, testified that he would generally go out to Williams Station at the request of a representative of SJWC, and not on any regularly occurring schedule, and he would get requests to go to Williams Station about half a dozen times each year. Although he answered in the affirmative when asked if he thought Valley Crest (i.e., BrightView) was "proactive in terms of identifying tree care needs at the Williams [S]tation San Jose Water Company property," he also answered in the affirmative when asked if "the only time [he] would really go out there was in relation to a specific request that San Jose Water Company made." He added, "Unless I was driving by and saw something." This testimony does not demonstrate that Wahlberg thought he had any affirmative duty to regularly visit and inspect Williams Station for tree care issues. SJWC relies on Wahlberg's testimony that, when informed by Cabernet Vineyards of the overgrowth, he considered it "appropriate" to notify SJWC of the condition, but we do not read his willingness to do so on this one occasion as imposing on BrightView a contractual duty to "proactively" monitor the SJWC property.

SJWC's person most knowledgeable, Vais, also testified that tree care issues would be addressed "[w]hen a work request would come in" and that he would just respond to tree care needs on an as-needed basis. He responded, "Correct," when asked to confirm that it was "not [his] expectation that [BrightView] would be doing inspections for tree care during [its] work at the Williams Station facility."

Both the language of the Agreement, and the testimony of the two individuals with firsthand knowledge of the actual conduct of the parties under the Agreement and Williams Station, lead to the conclusion that BrightView had no affirmative duty to

11

inspect Williams Station for tree care issues or to correct any issues that might arise without first obtaining a work order from SJWC to authorize the work. Without such a duty, it cannot be said that the injury to Adams arose out of BrightView's "services" under the Agreement when BrightView had not yet taken any corrective measures for the tree situation at that time.[3] Accordingly, BrightView has met its initial burden to show that it has no indemnity obligation under the Agreement based on Adams's claims.

As in the trial court, SJWC continues to argue on appeal that BrightView utilized a proactive approach to identify tree care needs and generate work orders. As an example, SJWC points to Wahlberg's walkthrough of the Cabernet property and subsequent authorization from Vais to take care of the overhanging trees. But Wahlberg's walkthrough of the Cabernet property was in furtherance of BrightView's independent contractual agreement with Cabernet. The fact that Wahlberg might bring an issue to Vais's attention on the occasions when he happened to see one—incidental to his duties to Cabernet—does not raise any triable issue of material fact regarding BrightView's obligation under the Agreement with SJWC. BrightView and Wahlberg had no duty to perform any regular inspection at Williams Station nor authorization to perform "services" without first obtaining a work order from Vais.

SJWC relies on the earlier proposal from Valley Crest to assert that BrightView was to provide proactive tree maintenance services. But SJWC provides no evidence showing that any portion of the proposal was incorporated into the Agreement. The Agreement is silent as to any such expectation and also contains an integration clause, which provides that the "Agreement, any attachments hereto, together with the executed Work Orders and any attachments referenced thereto shall constitute the entire Agreement of the parties and supersedes any prior agreements between them, whether written or oral, with respect to the subject matter hereof." This forecloses an

---

[3] We therefore do not reach the question of whether Adams's claims were "caused by SJWC's sole or active negligence."

12

interpretation reading the "proactive" aspect of the Valley Crest proposal into the Agreement. (See *Grey v. American Management Services* (2012) 204 Cal.App.4th 803, 807 [the existence of an integration clause is a key factor in determining whether the parties intended the contract to be a final and complete expression of their agreement].)

SJWC argues that Wahlberg knew about the condition of the trees nine days before Adams was injured and, once he contacted SJWC about the overhanging trees after his walkthrough at the Cabernet property, received immediate approval to address the problem. This, SJWC contends, shows that Wahlberg either failed to timely inform SJWC about the trees in time or failed to timely perform the work despite authorization from SJWC.

SJWC concedes that it is not known when Wahlberg contacted SJWC about the trees and that no written work order exists.[4] SJWC appears to contend that BrightView had some affirmative obligation to notify SJWC within a certain timeframe or otherwise complete the work before the injury-causing incident. But this contention cannot be reconciled with the absence of an affirmative obligation or authorization under the Agreement to independently inspect or work on any trees without SJWC issuing BrightView a work order. With no evidence showing that BrightView received authorization to work on the overhanging trees prior to Adams's injury, SJWC has not raised a triable issue of material fact regarding any services provided by BrightView prior to or in connection with the injury.

SJWC alternatively argues that it does not matter whether BrightView actually performed or failed to perform under the contract, because the indemnity provision in the Agreement applies whether or not BrightView caused Adams's claims. SJWC bases this

_____

[4] BrightView's material fact number 37 states that Wahlberg contacted Vais "[w]ithin the next month" after the inspection at the Cabernet property. The evidence cited to does not support that assertion, however. It consists only of Wahlberg's testimony that the work was done on August 10, 2016.

13

argument on language in the indemnity provision specifying that indemnity, where otherwise applicable, will be required "whether or not such claims, demands, or liability are caused by Contractor" or its agents. But this clause only limits and does not negate the express condition that the claim, demand, or liability must "arise . . . in connection with" BrightView's performance. The clause is not reasonably interpreted as mandating indemnity even when a claim does not arise from or in connection with the performance of services under the Agreement. SJWC need not prove that BrightView caused Adams to injure her ankle in order to invoke BrightView's duty to defend and indemnify, but what it would still need to prove is that Adams's injury "arose in connection with" BrightView's performance of services under the contract.

BrightView having met its initial burden, SJWC has failed to present evidence raising a triable issue of material fact that Adams's claims arose from or in connection with BrightView's performance of services under the contract. Accordingly, as a matter of law, BrightView has established it owes SJWC no duty of indemnity or defense as to Adams's claims.

### III. DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to BrightView.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*San Jose Water Company v. Brightview Landscape Services, Inc.*
H049017